George C. Lazar
Nev. Bar No. 6030
525 "B" Street, Suite 1500
San Diego, California  92101
Tel:    877.272.3734
Fax:    877.227.0150
Email: glazar@foxjohns.com

Attorney for United Central Bank
a Texas state bank

Counsel Designated for Service of
Papers Per LR 10-1(b)

Larry C. Johns
LAW OFFICE OF LARRY C. JOHNS
3017 W. Charleston Blvd., Suite 30
Las Vegas Nevada 89102

Electronically Filed 12/26/11

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

NORTHERN DIVISION

| | |
|---|---|
| In Re:<br><br>DHILLON GROUP, LLC<br>dba Holiday Inn Express<br>2902 Michelle Dr.<br>Sherman, TX 75092<br><br>Debtor | CASE NO. 3:11-bk-53706-btb<br>Chapter 11<br><br>OPPOSITION OF UNITED CENTRAL BANK TO DEBTOR'S APPLICATION FOR INTERIM AND FINAL ORDERS FOR USE OF CASH COLLATERAL [Doc 17]<br><br>Date:  January 3, 2012<br>Time:  2:00 p.m. |

## INTRODUCTION[1]

The debtor's sole asset, a Holiday Inn Express in Sherman, Texas, is not currently operating. It has been closed because there is flood damage.

In spite of the fact the hotel is not currently generating any cash from its operations, the

---

[1] By the filing of this opposition, United Central Bank does not waive its previously-asserted contention that venue is not proper before this Court and that the proceeding must be dismissed or transferred. See Doc 8.

- 1 -

debtor has brought a motion for use of cash collateral. What becomes apparent upon an examination of the motion is that it is not really a motion to use post-petition cash generated by the debtor; it is a motion by which the debtor seeks to have this Court determine the debtor's rights in pre-petition insurance proceeds which are held by United Central Bank ("UCB").

In fact, the debtor has no rights in the insurance proceeds. By virtue of the deed of trust which secures UCB's interest, the bank, not the debtor, is the owner of the insurance proceeds. And, there is no basis under Texas law to compel the bank to disburse the proceeds for the benefit of the debtor.

Even if the debtor believes it has some right in the proceeds - although there is nothing in the motion which purports to set forth a basis for that right - the debtor ignores the requirement that any dispute over the rights in bank's collateral must be resolved by an adversary proceeding. The pending motion should be summarily denied because the issues raised in the motion cannot be resolved by motion.

Even if the motion were properly before the Court, there is no basis for an order allowing use of cash collateral. The debtor fails to satisfy its evidentiary burden of showing the bank would be adequately protected.

STATEMENT OF FACTS

A.    The UCB Loan

UCB made a loan (the "Loan") to the Dhillon Group on or about May 30, 2008. The debtor executed a note (the "Note"), a copy of which is attached the Declaration of Alvin Pedescleaux in Support of United Central Bank's Opposition to Debtor's Motion for Use of Cash Collateral ("Pedescleaux Declaration") as Exhibit A, documenting the Loan and the debtor's repayment obligation. Repayment of the Note is secured by a Deed of Trust, a copy of which is attached to the Pedescleaux Declaration as Exhibit B. In addition, the debtor executed an Assignment of Rents and Leases, a copy of which is attached to the Pedescleaux Declaration as Exhibit C. As the loan documents show, the security instruments were recorded.

The loan matured in May of 2011. A short extension was negotiated. However, this

extension was never actually implemented because the debtor was unable to bring the loan current, which was a condition of the loan extension. UCB issued its demand letter on August 30, 2011; a copy is attached to the Pedescleaux Declaration as Exhibit D.

After UCB issued its demand letter, the debtor requested that UCB grant an interest only period from July, 2011 through March, 2012 and that the loan maturity be extended to March, 2012. This request was considered by UCB's senior management and was ultimately denied in late October. Thereafter, foreclosure proceedings were commenced and a foreclosure sale was set for December 6, 2011. The foreclosure sale was stayed by the filing of this proceeding.

B.     The Loan Default

The Note is in default. The Note has matured and is all due and payable. The last payment made on the Note was made on August 4, 2011 and paid interest through February 23, 2011. As of December 22, 2011, the amount owing on the Note, exclusive of expenses (including foreclosure costs) and attorney's fees and costs and also exclusive of the default interest that is owing, is as follows[2]:

| | |
|---|---|
| Principal: | $6,024,646.77 |
| Interest to 12/22/11 | $356,281.98 |
| Late Charges | $64,368.85 |
| TOTAL: | $6,445,297.60. |

C.     The Insurance Proceeds

The property which secures the UCB Loan was damaged because of a flood. UCB has a perfected security interest in all the insurance proceeds by virtue of the security documents executed in conjunction with the Loan; for example, the deed of trust states as follows:

---

[2] As is discussed below, UCB is entitled to the apply the insurance proceeds received from damage to the Bank's security to the outstanding loan. That application has not been made because of this pending proceeding.

> Should any loss occur to the insured property, Mortgagee is hereby appointed attorney-in-fact for Mortgagor to make proof of loss if Mortgagor fails to do so promptly, and to receipt for any sums collected under said policies, which said sums or any part thereof, at the option of Mortgagee, may be applied as payment on the indebtedness hereby secured, or to the restoration or repair of the property so destroyed or damaged. Mortgagor promptly will give notice by mail to Mortgagee of any loss or damage to the Mortgaged Property and will not adjust or settle such loss without the written consent of Mortgagee.

After learning of the damage, the Bank sought to learn from Mr. Dhillon the status of the debtor's request for insurance proceeds. The Bank was assured by Mr. Dhillon for an extended period that no insurance proceeds had been received.

UCB first became aware of the payment of some insurance proceeds in mid-September, 2011. This occurred because the debtor's insurance company finally issued a check - its check of of September 12, 2011 - which named UCB as a joint payee; the debtor could not negotiate the check without the bank's consent. A meeting was held in Texas on September 16, 2011 at which use of these proceeds was discussed with Mr. Dhillon and the debtor's attorney, Mr. Portela. However, it was not until a meeting in late September that the debtor disclosed to UCB that in fact substantial insurance proceeds had already been received. Mr. Dhillon confirmed to Crystal Howard of the bank's special assets group, in writing, that checks totaling $882,374.34 had been issued to the debtor by the insurance company before UCB was advised of the insurance payments[3]. A copy of the email correspondence confirming the debtor's receipt of insurance proceeds in excess of the September check is attached to the Pedescleaux Declaration as Exhibit E.

UCB maintains a spreadsheet which tracks the Bank's information relating to the insurance proceeds. The spreadsheet reflects that there is $223,005 in the proceeds of the insurance company payments that were not made by joint check naming UCB that the debtor has failed to account for. The debtor has refused to disclose how the unaccounted-for funds were used.

The disbursement of insurance proceeds without UCB's knowledge came to an end in September of 2011 when the insurance company issued the joint check naming UCB as a payee for

---

[3] UCB is attempting to learn how these insurance proceeds were used. In addition, UCB may have a claim against the insurance company or the debtor for conversion of the proceeds due the bank.

1   $337,750.71. The proceeds of that check were deposited into an account at UCB. Prior to the

2   decision not to grant the extension of the loan modification, the debtor requested, and UCB agreed

3   to, the disbursement of certain of the insurance funds that had been paid to the bank. The

4   spreadsheet prepared by Ms. Howard shows these disbursements. The balance of the insurance

5   proceeds currently held by UCB is now $216,470.08. This is less than the $300,000 in proceeds the

6   debtor claims in its moving papers.

7   Because of the default under the Note and the failure of the debtor to comply with the terms

8   of the Deed of Trust in the adjustment of the insured loss, UCB has decided not to allow use of the

9   insurance proceeds for the repair of the insured property. It has asserted its right to apply those

10  insurance funds against the debtor's indebtedness.

## I.

### THE DEBTOR HAS NO PROPERTY INTEREST IN THE INSURANCE PROCEEDS.

15  The debtor's cash collateral motion is based upon the unexamined, and erroneous,

16  assumption that the debtor has an interest in the insurance proceeds held by UCB. As an

17  examination of the applicable law establishes, the debtor has no interest in the insurance proceeds.

18  Cash collateral is defined, in Section 363(a)[4], to be, in essence, cash or cash equivalents in

19  which the estate and an entity other than the estate both have an interest. The determination of

20  whether a debtor owns an interest in property upon a bankruptcy filing is made by resort to

21  nonbankruptcy law. *Butner v. United States*, 440 U.S. 48, 55 (1979); *California v. Farmers Mkts.,*

22  *Inc. (In re Farmers Mkts., Inc.)*, 792 F.2d 1400,1402 (9th Cir.1986); see also, *In re Las Vegas*

23  *Monorail Co.*, 429 B.R. 317, 332 - 337 (Bkrtcy Nev. 2010), applying Nevada law to determine

24  extent of security interest.

25  Contrary to the position asserted in the motion, the debtor's schedules essentially admit that

26  the debtor has no interest in the funds held by UCB. There is no mention in Schedule B as filed in

---

[4]     Section references are to the Bankruptcy Code.

- 5 -

this action of the insurance proceeds held by UCB; the only insurance related assets debtor identifies is an account receivable (cash, of course, is not an account receivable) which it characterizes as an "insurance claim for loss and for bad faith."

Nor can the debtor establish under Texas law that it has any ownership interest in the insurance proceeds held by UCB. The agreement of the parties as set forth in the loan documents recognizes that insurance proceeds are the property of the bank, not of the borrower. In *English v. Fischer*, 660 S.W.2d 521 (Sup. Ct. Tex. 1983), the Supreme Court considered the question of whether a homeowner - who had executed a deed of trust which provided that proceeds of an insurance policy paid for by the homeowner should be paid to the lender - could compel the lender to release its right to the insurance proceeds to allow the homeowner to rebuild the destroyed home. The Texas Supreme Court reversed a lower court judgment in favor of the homeowner and entered judgment in favor of the lender. In doing so, the Supreme Court enforced the agreement of the parties. See also, *Breton, LLC v. Lincoln Nat. Ins. Co.*, ___ F.Supp.2d ____, 80 FedRServ.3d 462 (E.D. Va 2011) (citing *English v. Fischer)*. The decision is *English* states the majority rule. *General G.M.C. Sales, Inc. V. Passarella*, 195 N.J.Super. 614, 620 - 622 (N.J.Sup.Ct. Appellate Div. 1984).

Both the case law and the debtor's own admissions establish that it has no right to the monies held by UCB. There is no cash collateral held by UCB because the debtor does not have an interest in the insurance proceeds that were paid to UCB.

II.

EVEN IF THE INSURANCE PROCEEDS ARE POSSIBLY
CASH COLLATERAL, THE DEBTOR FAILS TO SHOW
IT IS ENTITLED TO HAVE THIS COURT ORDER
THEIR USE FOR RECONSTRUCTION.

The relief requested by the debtor's cash collateral motion is simply stated by the debtor: it wants this Court to order UCB to release, without any conditions, the insurance proceeds now in the Bank's possession. Such an order, as noted above, is directly contrary to Texas law. In addition, the debtor fails to establish that the Court can order such a disbursement on this motion for use of

- 6 -

cash collateral[5].

### A. The Order the Debtor Seeks is Contrary to Texas Law.

As discussed above, the Texas Supreme Court has held that where, as here, the proceeds of an insurance policy are for the benefit of a secured party, a court cannot order that the proceeds be released by the secured party for rebuilding. The debtor does not establish why it is entitled under Texas law to the order it seeks.

### B. The Debtor Cannot Obtain the Relief Requested by Motion.

Bankruptcy Rule 7001 defines an adversary proceeding to include "a proceeding to determine the validity, priority, or extent of a lien or other interest in property." (Rule 7001(2).) The motion presently pending before the Court is, in essence, an effort to establish the debtor's interest in the insurance proceeds held by United Central Bank. The Court cannot determine the debtor's rights, if any, in the insurance proceeds by motion.

### C. There is No Basis for an Interim Order.

Bankruptcy Rule 4001(b)(2) provides that a court may authorize the use of cash collateral before a final hearing, but only if the funds are to be used "to avoid immediate and irreparable harm." As set forth in the proposed order, the debtor seeks to use the insurance proceeds for all uses permitted by the proposed budget (Exh. C to the Motion), including, apparently, commencing the repair of the now-shuttered hotel premises.

There is no showing that this use of the funds - commencing repairs - is necessary to avoid immediate and irreparable harm. The best evidence that the requirements for interim use of cash collateral cannot be satisfied is the debtor's delayed filing of this motion.

This proceeding was commenced on December 5, 2011. The cash collateral motion was not filed until December 15th, ten days after this matter was initiated. There was, apparently, nothing

---

[5] The following argument does not waive the Bank's argument that the debtor has absolutely no property interest in the insurance proceeds.

1  that required a prompt filing for interim relief..

2  The debtor's sole asset has been shut down for an extended period of time. It has been

3  boarded up. There is not a scintilla of evidence before the Court that protection of the hotel property

4  provides a basis for use of any cash collateral.

5  As Rule 4001(b)(2) sets forth, interim use of cash collateral is an extraordinary event, which

6  requires that there be compelling justification for that use. Here, the debtor has not satisfied the

7  standard for interim use.

8

9  D.     The Debtor Does not Establish that UCB is Adequately Protected.

10  In his recent decision in *In re Las Vegas Monorail Co., supra*, Judge Markell discussed the

11  concept of adequate protection in the context of a request for use of cash collateral:

12  > Adequate protection . . . is a concept that Section 361 of the Code illustrates, but does not define. That section recognizes that, to the extent that use of cash collateral
13  > "results in a decrease in the value of such entity's interest in such property," adequate protection may consist of cash payments or replacement liens. 11 U.S.C. § 361(1),
14  > (2). In addition, the estate may provide other forms of adequate protection so long as they "will result in the realization by [the secured party] of the indubitable
15  > equivalent of such entity's interest in such property." 11 U.S.C. § 363(3).

16  > * * * * * *

17  > The general purpose of adequate protection is to ensure that the secured creditor ultimately receives what it would have received had not bankruptcy intervened. "
18  > 'Although stripped of the right to immediate possession of its property, the creditor receives assurances that the value it could have received through foreclosure will not
19  > decline.' " *In re ProAlert*, 314 B.R. at 441–42 (quoting 3 JAMES F. QUEENAN, JR. ET. AL, CHAPTER 11 THEORY AND PRACTICE § 16.03 (1994)).
20

21  429 B.R. at 326 - 327. Further, as set forth in Section 363(p), the debtor bears the burden of proof

22  to establish the secured creditor receives adequate protection.

23  Given the foregoing, the question of whether the debtor establishes that UCB will be

24  adequately protected can be resolved into the following: What evidence does the debtor present that

25  if the insurance proceeds of $216,000 (approx) are released to it, that at the end of the day, UCB will

26  be guaranteed to receive the "indubitable equivalent" of those proceeds?

27  The answer, of course, is none. In fact, the documents presented to the Court on the motion

28  (which are not really evidence) provide no assurance the bank would receive the "indubitable

equivalent":

- The debtor presents a construction "estimate" (Exh. B to Debtor's Cash Collateral Motion), which suggest that repairs of approximately $600,000 are necessary to bring the hotel into a condition to reopen. This is not a binding contract, nor has UCB had the opportunity to determine if this estimate is realistic.

- The proposed budget (Exh. C to Debtor's Cash Collateral Motion), is inconsistent with the estimate of repairs. The "Casualty Loss Repair Cost" is estimated to be $540,000. This is $60,000 less than the estimate. The debtor's own evidence shows that it cannot complete the repairs under the proposed budget.

- There is no evidence of adequate funds to complete the repairs. UCB holds approximately $216,000. Using the debtor's construction estimate, it needs an additional $380,000 (approx) for the construction. The debtor does not point to any source for these funds. And, the schedules show the debtor has no readily-available cash to make up this shortfall[6].

- There is no assurance that any construction funds would properly be disbursed. To control cash, lenders typically use a fund control, or other disbursement control, to prevent against cost overruns, potential lien claims, and diversion of funds. The debtor provides for no such protection.

Without stating in so many words, what the debtor appears to want to argue is that if the insurance proceeds are released, the now-closed hotel can be converted into a going concern which will have an increased value of at least $216,000. What is undisputed is that there is nothing before the Court to suggest that this apparent argument has any validity: there is no evidence the hotel can be put in operating condition for $216,000 and there is no evidence that an operating hotel will, in fact, have a "going concern" value at least $216,000 greater than the current value. Without clear evidence that UCB will be assured that it will receive the equivalent of its $216,000, there is no basis for this Court to authorize the use of the insurance proceeds (if they are, in fact, cash collateral in which the debtor has an interest).

The case law cited by debtor does not support a cash collateral order in this case. All of the cases cited involve going concerns, not properties that require substantial capital investments. For example, in *In re Stein*, 19 B.R. 458, 460 (Bkrtcy E.D. Penn. 1982), the court had before it a going

---

[6] As noted in the Declaration of Alvin Pedescleaux, there appears to be over $200,000 in unaccounted insurance proceeds that were wrongfully delivered to the debtor. Perhaps those who are in possession of those funds will return them to the debtor. Even this amount would not be sufficient to put the hotel in an operating condition.

concern and evidence that the value of the lender's collateral was increasing; there is no such evidence here. *Federal Nat. Mortg. Assn. V. Dacon Bolingbrook Associates Ltd. Partnership*, 153 B.R. 204 (N.D. Ill. 1993) similarly involved a debtor which was operating a going concern; the district court allowed use of the rents for maintenance and repair in ongoing, income generating operations[7]. The other cases cited by the debtor also involved operating entities generating rents, where the court allowed those rents to be used by the debtor to maintain ongoing operations.

The debtor essentially is asking UCB to fund the equivalent of capital improvements with what the debtor claims is cash collateral. As a recent case emphasized, the risk of such a proposed use cannot be visited upon the secured lender:

> The viability of the projections in the Budget has not been proven, but even if the Budget were proven to be reasonable, the Court cannot allow the Debtor to fund capital improvements from cash collateral without [the lender's] consent or a replacement lien on previously unencumbered assets that affords [the lender] dollar-for-dollar protection for the diminishment in its cash collateral projected during the last quarter of 2011. See *Desert Fire Protection v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434 B.R. 716, 727 (S.D.Fla.2010) (use of cash collateral requires dollar-for-dollar adequate protection in the form of new collateral). The Debtor has not demonstrated the Property will be enhanced, dollar-for-dollar, by the expenditures proposed by the Debtor. The possibility that the Debtor's rental program may perform as projected does not justify shifting the risk of success or failure from the Debtor to [the lender]. *Resolution Trust Corp. v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.)*, 16 F.3d 552, 557 (3d Cir.1994) (en banc) ("Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects.") Clearly, if the Debtor does not perform as projected in the Budget, the adverse effects will be visited upon [the lender].

*In re Harbour East Development, Ltd.*, 2011 WL 6097063, *4 (Bkrtcy S.D. Flor. Dec. 6, 2011)

The same considerations and concerns dictate that release of cash collateral for a construction project, without adequate protection, would be improper.

---

[7]   *In re Triplett*, also relied upon by the debtor, has been questioned as improperly interpreting the rules relating to use of cash collateral. *Travelers Insurance Company v. Plaza Family Partnership (In re Plaza Family Partnership)*, 95 B.R. 166, 172 - 173 (E.D. CA 1989).

## CONCLUSION

The debtor has applied for an order compelling UCB to release insurance which are properly the bank's property. It has ignored the applicable law, ignored the fact that the issues raised cannot be resolved by motion, failed to present any evidence that it has the available funds to actually make repairs, and presented nothing to show UCB will be adequately protected.

For all of the reasons set forth above, not only should interim use of cash collateral be denied, but a final hearing should not be set: there is no cash collateral which is the subject of the pending motion.

DATED: December 26, 2011            /s/ George C. Lazar
                                    George C. Lazar, Attorney for United Central Bank
                                    NV Bar No. 6030
                                    525 B Street, Suite 1500
                                    San Diego, California 92101
                                    Tel:   877-272-3734
                                    Fax:   877-227-0150

CERTIFICATE OF SERVICE

On December 26, 2011, a true and correct copy of the attached document was served as follows:

By the Court's ECF System (Local Rule 5005(c)):

A.J. KUNG on behalf of Debtor DHILLON GROUP, LLC
ajkung@ajkunglaw.com, bbrown@ajkunglaw.com; paralegal7@ajkunglaw.com; paralegal4@ajkunglaw.com; paralegal5@ajkunglaw.com; paralegal3@ajkunglaw.com; fileclerk@ajkunglaw.com; paralegal1@ajkunglaw.com

U.S. TRUSTEE - RN - 11   USTPRegion17.RE.ECF@usdoj.gov
(A courtesy copy was directly email to Bill Cossit at: Bill.Cossitt@usdoj.gov

By U.S. Mail:

A copy of the attached document was placed in addressed envelope(s) and the envelope(s) containing the document were placed into the U.S. Postal Service mail on December 26, 2011 at San Diego, California; copies were mailed to:

None

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: December 26, 2011            /s/ George C. Lazar
                                    George C. Lazar

- 1 -