IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DHILLON GROUP, LLC, | § | CASE NO. 12-40163-btr |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

**UNITED CENTRAL BANK'S OBJECTIONS TO**
**DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION**

COMES NOW UNITED CENTRAL BANK ("UCB" or "Lender") and files this its Objection to Confirmation of Debtor DHILLON GROUP, LLC's First Amended Plan of Reorganization (the "Plan"), and in support thereof would show as follows:

1. Debtor's Chapter 11 Plan was filed on March 16, 2012 [Docket No. 87], and amended on April 26, 2012 [Docket No. 103].

2. UCB is the holder of a claim in the principal amount of $6,425,557.79 as of the date of the bankruptcy filing and is a Class 4 claimant and the largest claimant in Class 9.

**Jurisdiction**

3. This Court has jurisdiction over this Objection in accordance with 11 U.S.C. §§1101 and 365, and 28 U.S.C. §§157, 1334, and 2075. This is a core matter in accordance with 28 U.S.C. §157.

**Background Facts**

4. Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 5, 2011. The sole asset of Debtor is the Holiday Inn-Express in Sherman, Texas (the "Property"). The Debtor is not operating its business. Such business has been closed for repair since February 2011, due to water damage caused by an ice storm. The sum of $1,302,009.13 in insurance proceeds has been paid to the Debtor for the repair of the Property (an additional $345,000.00 was paid

for business loss); however $846,374.34 of such sum may not have been paid towards the repairs and all such sums cannot be accounted for by the Debtor. The current status of the insurance proceeds is as follows:

| DATE | AMOUNT | PAYEES |
|---|---|---|
| 2/24/11 | $15,000.00 | Claim advance paid to the Dhillon, Adjusters International |
| 3/16/11 | $327,800.97 | Dhillon Group, Adjusters International, and Belfor USA (for temporary and emergency repairs) |
| 3/16/11 | $332,267.13 | Dhillon Group and Adjusters International (for building ACV loss) |
| 3/16/11 | $36,306.24 | Dhillon Group and Adjusters International and (for business income expediting expense) |
| 9/12/11 | $337,750.71 | Dhillon, Adjusters International and United Central Bank (for building and contents, ACV, following appraisal award) |
| 9/12/11 | $117,884.25 | Dhillon Group, Adjusters International, United Central Bank, and Belfor USA Group (for Elevator repairs; check re-issued during interpleader due to being out-of-date) |
| 1/9/12 | $345,000.00 | Dhillon Group, Adjusters International, and United Central Bank (for business loss appraisal award) |
| TOTAL: | $1,647,009.30 | |

5. Pursuant to the terms of its Loan Documents, UCB is granted a security interest in the insurance proceeds and is assigned all proceeds for damage to the Property. Further, such Loan Documents gives UCB the right to apply the insurance proceeds to its indebtedness. Accordingly UCB asserts all of the insurance proceeds are its additional collateral. UCB acknowledges that other parties are claiming an interest in a portion of such proceeds but denies such claims are superior to those of UCB.

6. Repairs in the amount of at least $600,000.00 are still needed to enable the Property to be operational. Further, in addition to the $600,000.00 plus in repairs, the franchisor InterContinental Hotel Group ("IHG") requires 100% compliance with its Opening Day Checklist, that a full mold test be completed and passed, that all renovations must be "to like new quality", certain ADA requirements be

satisfied, as well as, 11 items of repairs set forth in a May 29, 2012 site inspection. Each of these must be complied with before the hotel can be re-opened and the license retained.

7.    UCB, the Debtor's primary secured creditor is, by virtue of a promissory note dated May 30, 2008 in the original principal sum of $6,497,000.00 ("Note") associated Deed of Trust, Security Agreement and Assignment of Rents ("Deed of Trust") and related agreements executed and recorded contemporaneously therewith, the owner and holder of a first lien granted by Debtor on, among other things, the Debtor's real property, consisting of the Holiday Inn-Express located at 2909 Michelle Dr., Sherman, Grayson County, Texas (the "Property"). The Property, together with the rents, leases, and income therefrom, insurance proceeds and all personal property were pledged by Debtor to secure repayment of the Note to UCB.   Debtor defaulted in its payments under the Note, and UCB accelerated Debtor's obligations under the Note. Such Note matured on its own terms pre-petition.  As of December 5, 2011, the total due and owing from Debtor to Lender is $6,425,557.79, exclusive of ad valorem taxes, reasonable attorneys' fees, and later-accruing interest if applicable.

### Feasibility Concerns

8.    There are multiple serious reasons to doubt the feasibility of Debtor's proposed plan of reorganization. Below is a general description of the historical financial considerations that would render Debtor's Plan infeasible and likely to result in a post-confirmation liquidation or a second bankruptcy if the Plan is confirmed.

*Pre-Bankruptcy Performance.*

A.    Since the hotel first opened, Debtor has failed to generate sufficient income to pay its bills as such became due.  For example, Debtor failed to generate sufficient income to pay its ad valorem taxes in 2008, 2009, 2010 and 2011.  As a result of such failure to generate sufficient income, Debtor (in violation of the terms of the Deed of Trust)

borrowed monies from Property Tax Lending, LP on three separate occasions for the 2008, 2009, and 2010 property taxes. Property Tax Lending, LP has filed a secured Proof of Claim in the amount of $498,418.81. The 2011 taxes have not been paid and are owing in the approximate amount of $113,000.00.

*Post-Bankruptcy Operations-to-Date*

B.  Since the Property has been shut down since February 2011, no income has been generated and no taxes have been paid. Debtor has not shown any basis to infer or believe that Debtor's post-confirmation performance will yield profitability when such has never been profitable since Debtor purchased the Property in 2008.

*Post-Confirmation Scenarios*

C.  Debtor's financial picture, woeful before bankruptcy and nonexistent during bankruptcy, would become markedly worse if the Plan was confirmed. Rather than reduce Debtor's monthly expenses, to service its obligations under the Plan, Debtor would be *adding* payment obligations it has not previously been servicing to those it has previously been struggling to service pre-petition. Further, Debtor assumes it will generate income in June, July and August 2012 when the hotel will not even be operational until the earliest September 2012 under Debtor's best case scenario. Further, the Debtor's projections assume that it will immediately generate $150,000.00 per month in revenue the moment the doors are re-opened after being closed for 19 months and it had not generated such monthly revenue during the previous full year of operations. According to Debtor's projections, Debtor would be *adding* monthly obligations (assuming Debtor's numbers to be correct) as follows:

   1)   $3,296.00/mo. for Class 2 (Allowed Secured Tax Creditor Claims);

   2)   $976.00/mo. for Class 3 (Allowed Priority Creditor Claims);

   3) $18,960.00/mo. For UCB (Class 4);

   4) $72.00/mo. for Lakwinder Guru's secured claim in Class 5;

   5) $144.00/mo. for Maluk Dhami's secured claim in Class 6;

   6) $7,242.00/mo. for Property Tax Lending's secured claim (Class 7);

   7) $70.00/mo. for Allowed Priority Claims; and

   8) $2,000.00/mo. for General Unsecured Creditors (Class 8).

All totaled, the Plan purports to *add* $32,760.00 per month to Debtor's already unprofitable bottom line. This does not take into account Debtor's modification filed on May 30, 2012 wherein Debtor has agreed to increase the interest rate paid to Property Tax Lending from 3% to 12%. Such increases the monthly payment to the Class 7 claimant from $7,242.00 to $11,087.08.

 D. Moreover, it is clear that Debtor's figures are NOT accurate. For instance, the Plan proposes to pay UCB's secured claim at a value of $3,500,000.00 with an interest rate of prime plus 1% for the first year and prime plus 2% for years 2 and 3, with a balloon due at the end of three years. Such payments are based on a 25 year amortization. However, Debtor's Disclosure projections set forth a monthly payment of $18,960.00 for all three years of the Plan. UCB would have a monthly payment of $18,960.00 for the first year, but such would increase to $20,973.67 for years 2 and 3, resulting in an immediate shortfall.

 E. Debtor proposes that its principal Jag Dhillon will fund the minimum sum of $350,000.00 to make all repairs at the hotel, to cover debt service while the repairs are being made, and to cover any shortfall. Such is simply not feasible. The $350,000.00 deposited is dedicated solely to fund a portion of the needed repairs which exceed

$600,000.00. Without even addressing the expenses, at a minimum, Debtor will need at least the sum of $32,760.00 for the months June, July, and August for a total of $98,280.00 and three months of property taxes for 2012, equal to $27,000.00 for a total of $125,280.00. The total shortfall is at least $125,280.00 for such three month period. This does not take into account the increased payment to Property Tax Lending under the modification. The plan provides no mechanism or any suggestion of how Mr. Dhillon can make such payments. On April 16, 2012, UCB obtained an Interlocutory Default Judgment against Mr. Dhillon in the amount of $9,536,220.51. Mr. Dhillon testified his income is roughly $50,000.00 per year at the Motion to Lift Stay Hearing. It appears certain that Debtor's principal does not have sufficient monies to fund the payments under the Plan thus evidencing that the Plan does not have a "reasonable probability of success".

F. The Debtor's plan purports to value the Property at $3,500,000.00. Such valuation is confusing at best and is nebulous as to the application of the insurance proceeds to UCB's debt and the resulting value of the Property. The Bank's value of the real and personal property as shown by a recent "as is" appraisal is $4,700,000.00 without taking into account the insurance proceeds and its Allowed Secured Claim should be at least $4,700,000.00 without taking into account such insurance proceeds. The Debtor's own projections show the Plan is not feasible at the $3,500,000.00 value, much less the $4,700,000.00 value shown by UCB. Further, the Debtor fails to recognize any future appreciation of the Property as a result of either the completed repairs or economic factors. Moreover, Debtor is only proposing payment of an interest rate of prime plus 1% for the first year. Such rate is inadequate to return to UCB the present value of its

claim and in not an appropriate rate. The proper rate of cramdown interest should be determined by using the formula approach or at a minimum the contract rate of 7% per annum to account for the risk level.

G. The chart below sets forth the payments to UCB at different valuations and different interest rates. Such further calculations evidence the Plan is not feasible.

| | **INTEREST RATE** | | | | |
|---|---|---|---|---|---|
| **VALUE** | 4.25% | 5.00% | 5.25% | 6.00% | 7.00% |
| 3,500,00.00 | 18,960.00 | 20,460.00 | 20,973.00 | 22,550.00 | 24,737.00 |
| 4,250,00.00 | 23,023.00 | 24,845.00 | 25,468.00 | 27,382.00 | 30,038.00 |
| 4,700,00.00 | 25,461.00 | 27,475.00 | 28,164.00 | 30,282.00 | 32,218.00 |

All calculations are based on Debtor's proposed 25 year amortization.

7. Lastly, the Plan provides that the Debtor will pay the allowed secured claim of UCB in full at the conclusion of three years from confirmation of the Plan. While it is obvious from the above that Debtor's survival for three years under the Plan, without substantially more funds invested from the outside, is virtually inconceivable, the Plan provides no mechanism or any suggestion for how Debtor will meet this significant obligation. Assuming Debtor was to service UCB's obligation as stated in the Plan for the full 36 months by making the monthly payments that an accurate amortization calls for ($18,960.00 per mo.), the remaining "balloon" payment due at the conclusion would be $3,248,408.30

under Debtor's valuation of $3,500,00.00. The Plan does not shed light on how Debtor will cause this to occur, whether through refinancing or otherwise.

### Absolute Priority Rule and Effect on General Unsecured Creditors

8. The combined effect of the Plan as it is presently constituted, as discussed infra, renders illusory (or, at minimum, far less significant) the impact of Mr. Dhillon's capital contribution. This has the dual effect of: (a) making any meaningful distribution to unsecured creditors a remote possibility, if not a certain impossibility; as such monies are used to fund a portion of the repair costs; and (b) providing Debtor's insiders with a "cheap" means of retaining their equity in the Debtor to the exclusion of General Unsecured Creditors.

9. Under 11 U.S.C. §1124, the claims of UCB (under Class 4 and Class 9) are believed to be impaired, and Debtor has admitted as much. UCB's interests will likely become further impaired if this Plan were to be confirmed, and UCB therefore objects to confirmation of the Plan.

### Objections to the Plan

10. For the reasons stated above and below, UCB objects to confirmation of the Debtor's Plan for the following reasons, including but not limited to the following:

 a) 11 U.S.C. §1129(a)(1) - for the reasons stated above and below, the Plan fails to comply with the Bankruptcy Code;

 b) 11 U.S.C. §1129(a)(2) - for the reasons stated above and below, the proponents have failed to comply with the Bankruptcy Code;

 c) 11 U.S.C. §1129(a)(3) - for the reasons stated above and below, the Plan is not proposed in good faith;

 d) 11 U.S.C. §1129(a)(7) - UCB, an impaired, secured creditor, is not receiving what it would receive if the Debtor was liquidated in Chapter 7;

 e) 11 U.S.C. §§1126 and 1129(a)(10) - UCB demands strict proof that at least one properly-properly-constituted and truly-impaired class has accepted the Plan. Dr. Soni is merely

        an equity claimant, an insider, and is not the holder of an unsecured claim and any ballot in favor of the Plan should not be allowed;

f)    11 U.S.C. §1126(g) - UCB objects to the holders of allowed claims in Class 11, Debtor's Equity Holders - - being impermissibly permitted to vote on the Plan inasmuch as the Plan should provide that the claims or interests in such class do not entitle the holders to receive or retain any property under the Plan on account thereof, such that members of this class would properly be conclusively, presumed to reject the Plan (see *Bank of New York Trust Co., N.A. v. Official Unsecured Creditors' Committee* (1n re *Pacific Lumber Co.*), 584 F.3d 229, 238 (5th Cir. 2009)) and the voting status of this Class appears to be for the sole purpose of generating a "cramdown class";

g)    11 U.S.C. §1129(b)(2)(A)(i)(11) - the Plan is not fair and equitable to UCB, since it fails to provide on account of secured claims such " . . . deferred cash payments totaling at least the amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property" and, particularly, does not provide sufficient capital to ensure that Plan payments will be made.  Further, the interest rate is not fair, and is inadequate to return UCB the present value of its claim and the Debtor fails to account for the anticipated appreciation of the Property inures to the benefit of UCB.  The Plan fails to provide for the full payment of all post-petition interest and fees to UCB during the pendency of the case as such plan proposes that equity is being retained;

h)    11 U.S.C. §§1129(b)(2)(B) and (C) the Plan permits creditors with claims junior to that of Claimant, rightfully a secured creditor with an unsecured deficiency owed, to receive distributions at the expense and to the exclusion of Claimant;

i)    11 U.S.C. §1129(a)(11) - the Plan is not feasible and will likely result in the filing of another bankruptcy case, and UCB demands strict proof of feasibility;

j)    11 U.S.C. §1129(b)(2)(C)(xii) - the Plan violates the "absolute priority rule" and, to the extent there exists an "equity contribution" or "new value exception" thereto, the purchase of Debtor's equity by Mr. Dhillon fails to meet the requirements of that exception; and

k)    11 U.S.C. §§1123(a)(3), (4), (5)(A), and (5)(G) - the Plan fails to specify the treatment of Lender's claims, by failing to state precisely the means for the repayment of the balloon payment due at the conclusion of the Plan.

11.    To the extent the Plan attempts to discharge the obligation of insiders and guarantors, UCB respectfully demands that the Plan be clarified and confirmed to reflect that subsequent to

confirmation its rights to pursue its remedies against third parties are not affected by confirmation. 11 U.S.C. §§524(e) and 1129(a)(3).

### Additional Discussion - Absolute Priority Rule

12.     The "absolute priority rule" dictates that no junior creditor is entitled to receive value from the estate relative to its claims unless and until senior creditors are paid in full.  To the extent that a "new value exception" to the "absolute priority rule" exists,' courts have held that this exception requires that the insiders, to retain any post-confirmation value on account of a plan, contribute both the determined amount reasonably equivalent to the economic value of the retained interest,' and in an amount which the bankruptcy court also determines to be "substantial." UCB objects to the Plan because: (a) it violates the absolute priority rule; (b) to the extent that the equity contribution exception to the absolute priority rule does not exist in the Bankruptcy Code; and (c) to the extent that the equity contribution exception does exist, (1) Lender demands proof that the real amount of the proposed contribution equals the value of the retained interest, and (ii) the amount of the proposed equity contribution meets the requirement of "substantiality".  It appears, from the Debtor's projections, that Mr. Mr. Dhillon is receiving all of his alleged $350,000.00 equity contribution in repairs back from the Debtor over a four month period beginning immediately upon the effective date with $100,000.00 each to be paid in June, July, and August and $50,000.00 in September.  The net benefit to General Unsecured Creditors from this "contribution" would be negligible at best, if not zero. This violates both the spirit and the letter of the absolute priority rule.

WHEREFORE, UNITED CENTRAL BANK respectfully prays that the Court deny confirmation of the Plan in its entirety and for whatever and further relief to which UCB may be justly entitled.

DATED  May 31, 2012.

        Respectfully submitted,

        **JONES, ALLEN & FUQUAY, L.L.P.**
        8828 Greenville Avenue
        Dallas, Texas 75243
        Telephone: (214) 343-7400
        Facsimile: (214) 343-7455

        By:   *s/ Laura L. Worsham*
                Laura L. Worsham
                State Bar No. 22008050
                Nathan Allen, Jr.
                State Bar No. 01071000

        Attorneys for UNITED CENTRAL BANK

**CERTIFICATE OF SERVICE**

        The undersigned hereby certifies that on the 31st day of May, 2012, I personally caused to be served a true and correct copy of the foregoing Objection to Confirmation by filing same with the Court's CM/ECF system which delivers electronic notice to all persons receiving service through such system, upon the following:

| | |
|---|---|
| Mr. John M. Vardeman<br>*U.S. Trustee*<br>Office of the U.S. Trustee<br>110 N. College Ave.<br>Suite 300<br>Tyler, TX 75702<br>**By Notice of Electronic Filing** | Ms. Joyce W. Lindauer<br>Attorney at Law<br>8140 Walnut Hill Lane, Suite 301<br>Dallas, TX 75231<br>**By Notice of Electronic Filing** |

                                                      /s/ Laura L. Worsham
                                                    Laura L. Worsham