```
 1              IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3

 4   IN RE:                  )    BK. NO:  12-40163-BTR

 5                           )

 6   DHILLON GROUP, LLC      )

 7       D E B T O R.        )

 8

 9

10            *   *   *   *   *   *   *   *   *   *

11              TRANSCRIPT OF PROCEEDINGS

12            *   *   *   *   *   *   *   *   *   *

13

14

15

16

17

18

19

20        BE IT REMEMBERED, that on the 4th day of June, 2012,

21   before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

1                    I N D E X

2                                                    PAGE

3    Exhibit Index                             3

4    JOSE POTELA
          DIRECT EXAMINATION
5              BY:  Ms. Lindauer               15
          CROSS-EXAMINATION
6              BY:  Ms. Worsham                24

7    ROGER PATE
          DIRECT EXAMINATION
8              BY:  Ms. Lindauer               31
          CROSS-EXAMINATION
9              BY:  Mr. Allen                  44
               BY:  Mr. Lerner                 52
10        REDIRECT EXAMINATION
               BY:  Ms. Lindauer               53
11

     JAG DHILLON
12        DIRECT EXAMINATION
               BY:  Ms. Lindauer               56
13        CROSS-EXAMINATION
               BY:  Mr. Allen                  90
14        REDIRECT EXAMINATION
               BY:  Ms. Lindauer               112
15

     RUSSELL RIVARD
16        DIRECT EXAMINATION
               BY:  Mr. Allen                  119
17        CROSS-EXAMINATION
               BY:  Ms. Lindauer               127

18

19

20

21

22

23

24

25

```
 1              E X H I B I T   I N D E X

 2                                          PAGE FIRST REFERENCED

 3  Exhibit Number 2                              35

 4  Exhibit Number 9                              22

 5  Exhibit Number 11                             42

 6  Exhibit Number 12                             43

 7  Exhibit Number 13                             52

 8  Exhibit Number 16                             37

 9  Exhibit Number 17                             43

10  Exhibit Number 18                             81

11  Exhibit L                                    110

12  Exhibit P                                    127

13  Exhibit R                                    101

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              COURTROOM DEPUTY:  Number 1 on the docket is

3    Dhillon Group, LLC.  Case 12-40163.  Confirmation hearing.

4              THE COURT:  Okay.  Appearances.

5              MS. LINDAUER:  Your Honor, could we have

6    maybe, we're trying to work out some stipulations that

7    might -- I'm sorry?

8         Oh, Joyce Lindauer for Dhillon Group, the debtor.

9         Your Honor, we're trying to work out some stipulations

10   that might shorten the actual amount of Court time that we

11   need.  So if we can maybe have about 10 minutes to try to

12   figure out if we can agree on some values.  That may

13   eliminate some expert testimony.

14             THE COURT:  All right.  We'll recess for 10

15   minutes.

16             MS. LINDAUER:  Okay.  Very good.  Thank you,

17   Your Honor.

18             (Brief recess ensued.)

19             COURTROOM DEPUTY:  Recall number 1, Dhillon

20   Group, LLC.  Case 12-40162.  Confirmation hearing.

21             MS. LINDAUER:  Your Honor, Joyce Lindauer and

22   Arthur Ungerman for the debtor, Dhillon Group, LLC.

23             MS. WORSHAM:  Laura Worsham and Nathan Allen

24   for United Central Bank.

25             MR. LERNER:  Good morning, Your Honor, Leib

1  Lerner of Austin & Berg for Holiday Hospitality Franchising,

2  Inc.

3              MR. BEAVIS:  Pritchard Beavis for Adjustors

4  International.

5              THE COURT:  Okay.  Do we have a telephonic

6  appearance?  Do we have a telephonic appearance?

7              MR. MYERS:  Yes.  This is Jonathan Myers on

8  behalf of Belfor USA Group Incorporated.

9              THE COURT:  Okay.  Ms. Lindauer.

10              MS. LINDAUER:  Thank you, Your Honor.

11      Your Honor, first of all I'd like to take care of a few

12  housekeeping matters.  We do have some stipulations on

13  exhibits.

14      If you turn to the debtor's exhibit binder, which are

15  the numbered exhibits.  The Bank's exhibits are letters.

16  Your Honor, I believe we have agreement to the admissibility

17  of the following exhibits.  Going through those, Exhibit

18  Number 1, which is the docket sheet.  That's stipulated to,

19  Your Honor.  Exhibit 2, which is the debtor's amended plan

20  dated April 26th.  That's admitted.  Exhibit 3, the

21  disclosure statement.  That's admitted.  4 is the

22  modification.  That's admitted.  5 are the debtor's schedules

23  and statement of affairs.  6 are the debtor's monthly

24  operating reports.  7 is the debtor's ballot tally.  8 is the

25  adversary complaint filed by Security National Insurance

1    Company.   9 is the agreed order on amended motion for payment

2    of money into the registry of the Court.   We're skipping

3    Exhibit 10.   Exhibit 11 are the operating requirements,

4    opening requirements with letter from Robert Stookey.

5    Exhibit 12 are the INA development and construction bid

6    costs.   13 is a certificate of mold damage remediation.

7    Exhibit 14 -- I may have mis-spoke, actually.   I think

8    Exhibit 10 -- I'm sorry, Exhibit 10 should come in.   I'm

9    sorry about that.   We would admit Exhibit 10, also, which is

10   the proof of funds.   We're not admitting Number 14, Your

11   Honor.   Exhibit 15, which is the defendant's motion for new

12   trial.   Exhibit 16 are the Holiday Inn required costs.

13   Exhibit 17 is actually a demonstrative exhibit.   It's only

14   being admitted, but not for the truth of the matter asserted.

15   And Exhibit 18 are revised debtor projections.   And so we

16   would offer 17 and 18 not necessarily for the truth of the

17   matters asserted, but as demonstrative exhibits.

18        And, Your Honor, with that, we would request that those

19   exhibits be admitted.   The only ones we've excluded then are

20   14 and 17 and 18 with condition.

21             THE COURT:   Okay.

22             MS. WORSHAM:   That's correct, Your Honor, as

23   to United Central Bank.

24             THE COURT:   Does anyone object to those

25   documents?

1       All right.  Since there are no objections, the Court

2  will admit Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

3  13, 15, and 16.  Exhibits 17 and 18 will be admitted solely

4  for demonstrative purposes.

5               MS. LINDAUER:  Your Honor, with regard to

6  UCB's exhibits, if you want to do those, Laura?

7               MS. WORSHAM:  Yes, Your Honor.  We have A

8  through W.  And the debtor agreed to the admissibility of all

9  of them with the exception of P, which is the appraisal

10  report dated April 24th of 2012.  So instead of going through

11  all of them, we would move that those be admitted, with the

12  exception of Number P -- Letter P.

13               THE COURT:  All right.  Is that an accurate

14  representation of the agreement of the parties, Ms. Lindauer?

15               MS. LINDAUER:  It is, Your Honor.

16               THE COURT:  All right.  Then Exhibits A

17  through W with the exception of P will be admitted.

18               MS. WORSHAM:  Your Honor, we additionally have

19  a couple of stipulations to present, if I might?

20               THE COURT:  You may.

21               MS. WORSHAM:  May I approach?

22               THE COURT:  You may.

23               MS. WORSHAM:  And, Your Honor, with the

24  revisions as Ms. Lindauer has made, we are stipulating as to

25  the interest rate at 5 percent for the first year as to UCB

1    and 5.25 percent for years 2 and 3 of the plan, subject to

2    the remaining objections.  The remaining stipulation set

3    forth the insurance proceeds, the amounts of them, and

4    reference that they are the collateral of UCB.  And with the

5    changes that Ms. Lindauer has made, we would ask that the

6    Court take notice of the stipulations.

7              THE COURT:  Okay.  So the stipulation is

8    paragraph 1, 2, and 3 and not 4; is that correct?

9              MS. LINDAUER:  That's correct, Your Honor.

10             THE COURT:  The Court will note the

11   stipulations for purposes of this trial today.

12             MS. WORSHAM:  Thank you, Your Honor.

13             THE COURT:  Your Honor, by way of opening, and

14   maybe I can help focus the Court's attention to what the

15   issues are in dispute in connection with this confirmation

16   proceeding.

17       We did receive objections from United Central Bank.  We

18   also received objections from Belfor.  Those are the only two

19   creditors that actually filed written objections to

20   confirmation.  As we present the case, Your Honor, other than

21   some stipulations and agreements, we don't have any

22   agreements with regards to confirmation, other than what

23   we've presented to the Court.  But I do think I can narrow

24   the Court's issues of where we are.

25             This debtor involves a hotel.  It was constructed in

1   2006.  It's fairly new.  It's operated as a Holiday Inn

2   Express in Sherman, Texas.  The debtor acquired the property

3   a number of years ago.  Paid 7.5 million for it when it was

4   purchased.  In the Spring, or actually early Winter of 2011,

5   there was a frozen pipe that burst in the hotel.  And as a

6   result, the hotel was flooded causing damage throughout the

7   hotel.  And so from that point forward, from about February

8   of 2011 to today the hotel has remained shut down.

9        The hotel was shut down for a couple of reasons.  There

10  were insurance claims made and there was a delay in receiving

11  at least initial insurance money.  And then there was a

12  dispute, obviously, with the Bank.  And that caused some of

13  the insurance money then to end up being held by the Bank.

14  And then by agreement in these proceedings, we agreed that

15  the Bank could hold further insurance money.

16       This case is a little different in the sense that there

17  ultimately will be somewhere in excess of $800,000 in

18  insurance proceeds related to the damage at the hotel.

19  Currently on hand there's about 680,000.  There's one

20  additional claim yet to be resolved.  And the proposal on

21  that claim is around 200,000.  So we're figuring about

22  880,000 in insurance money.

23       The debtor in this case opted to raise its own funds,

24  if you will, to repair the hotel and to agree that the Bank

25  could retain the insurance money, or at least if not all of

1  it a substantial amount of it, but roughly $750,000 of it and

2  apply that against its debt.  So there is some questions that

3  the Court has to decide.

4      First of all, if that amount is applied on the debt,

5  what amount is it applied to?  United Central Bank is owed

6  about 6.3 million in a total claim.  The value of the

7  property as is is somewhere between about 4.1 million and

8  maybe about 3.6 million.  There's a dispute over the current

9  value of the property is one of the issues the Court has.

10  And the question is then, and you'll hear some testimony on

11  this, is is the value as repaired, or is the value as is.

12  And then how do those insurance funds actually ultimately get

13  used, if you will, if UCB is allowed to retain those

14  insurance monies.  Obviously the insurance money should have

15  gone back in to repair the hotel.  Originally some of the

16  insurance money that was collected by the debtor did do that

17  a year ago.  But the substantial monies that we have now have

18  not.

19      The debtors propose to put in some $697,000 of new

20  money to repair the hotel and get it up and operating.  And

21  as a result, within about 60 to 90 days the hotel, if the

22  plan is approved, would again be operational, which obviously

23  benefits everyone sitting in this room, to the extent the

24  hotel then gets back up and going.  Of course, everyone wants

25  to point fingers at each other why the hotel has been shut

1    down.  Obviously the debtor complains that the Bank grabbed

2    the insurance money and the Bank complains, well, the debtor

3    should have fixed it up any way.  But irrespective, here we

4    are.

5        We do have a number of classes of creditors in this

6    case.  And I did provide to the Court a ballot tally.  That's

7    Exhibit 7.  And where we are on votes, Your Honor, is that we

8    have some of our small, I would say small secured creditors

9    classes, separate secured creditor classes have voted for the

10   plan.  That would be Class 5, Class 6.  And those are the two

11   small secured creditor classes that voted for the plan, along

12   with the priority creditors, which I don't believe count,

13   Your Honor, under the Bankruptcy Code.

14       The classes that voted against the plan would include

15   UCB, obviously, and then our unsecured creditor class voted

16   against the plan, as did a class we called, insurance proceed

17   claimants.  And what those are, those are companies that

18   claim they have a lien on certain insurance proceeds.  We

19   agree with UCB.  We think UCB actually has the prior lien on

20   all insurance proceeds.

21       So one of the questions for the Court is going to be

22   determining -- and the plan calls for this, the Court to

23   determine the value of the property.  And then how the

24   insurance proceeds are applied to that, either that value or

25   to the overall claim of UCB.  And, of course, how that has to

 1  be factored in here for determining the allowed amount of

 2  UCB's secured claim.  And I[m not sure the Court actually has

 3  to find that secured claim today.  But at least we need to

 4  know approximately what it is, because we have to make plan

 5  payments based on that.

 6        Then, Your Honor, with regard to the other objections.

 7  I think they're pretty much standard objections regarding

 8  good faith.  And probably the main objection, besides

 9  determining how UCB's claim is treated and dealt with would

10  be the question of feasibility, and will the debtor be able

11  to make the payments that are called for by the plan.  And

12  obviously the debtor would argue that with $697,000, that it

13  should be able to repair the hotel and make the payments

14  called for by the plan.  I believe UCB will disagree on that.

15        In any event, I think that we're prepared to put on

16  evidence regarding the treatment of UCB's claim.  And just --

17  we did stipulate, Your Honor, that the interest rate for the

18  first year of the plan for UCB would be 5 percent; for years

19  two and three would be 5.25 percent.  The plan is a three

20  year plan for the treatment of UCB's claim.

21        The ultimate exit strategy for the debtor is to sell or

22  refinance the property at the end of three years and pay off

23  the allowed secured claim amount of UCB, the taxes that are

24  owed on the property, and ultimately a return to the

25  unsecured creditors it what we're proposing.  And, Your

1   Honor, the reason for the three years, quite frankly, is that

2   the hotel has been shut down, obviously, for now a year, so

3   it's going to take at least two or three years to get it up

4   and running where we can actually get out of Dodge, if you

5   will, and pay off everyone that's proposed to be paid off

6   under the plan.

7        So what I want to make sure the Court understands, and

8   I think the Court does, is that there is a substantial amount

9   of cash being put into this particular case, more than we put

10  into normally a case like this.  And for good reason.

11  Obviously the debtor believes that the property has value and

12  can be repaired.  And then we'll have future value enabling

13  them to exit out of bankruptcy.

14       So with that, Your Honor, we're prepared to put on our

15  evidence.

16            THE COURT:  Any other party wish to make an

17  opening?

18            MS. WORSHAM:  Very briefly, Your Honor.

19       United Central Bank believes the evidence will show

20  that the plan violates Section 1129.  And that the totality

21  of the circumstances will show it's not proposed in good

22  faith, it's not fair and equitable when the Court considers

23  the fact.  It violates the absolute priority rule.  And the

24  plan is simply not feasible, Your Honor, even at debtor's low

25  valuation.

1      It's never been profitable in the entire time since

2    debtor has owned it and operated it.  The projections are

3    highly speculative and will likely result in the filing of

4    another bankruptcy case.  There's no economic reason to

5    confirm this plan.  There's no jobs to save.  There's no

6    operating business.  And the debtor's motives on this plan

7    will need to be examined.

8      As to the insurance proceeds.  United Central Bank

9    (indecipherable two words) additional collateral of the Bank

10   and they're not part of the valuation of the hotel real and

11   personal property.  Over $880,000 was paid to the Dhillon

12   Group in insurance proceeds before the Bank was ever made a

13   payee on the single insurance check.  So they've had almost a

14   million dollars worth of proceeds to put into the property.

15   And we'll show that all of the money simply did not go into

16   the property.  So those are the primary violations of Section

17   1129.  And rather than going through our objection at this

18   point, we'll reserve it until closing after evidence.

19      Thank you.

20          THE COURT:  All right.

21          MR. LERNER:  Your Honor, Leib Lerner for

22   Holiday Hospitality.  Just one very minor thing that's not

23   going to be at issue, I hope.

24      But this morning we worked out with the debtor that

25   there will be $2,500 in additional cure amount in Section

1  7.01 of the plan.

2                    MR. UNGERMAN:  That is correct, Your Honor.

3                    THE COURT:  Okay.  Thank you, Mr. Ungerman.

4                    MS. LINDAUER:  Your Honor, with that, I think

5  we'd like to call our first witness.  We would call Jose

6  Potela.  I think this will be a fairly short one.

7                    THE COURT:  All right.

8                    (The witness was sworn by the courtroom deputy.)

9                    <u>JOSE POTELA</u>

10   The witness, having been duly sworn to tell the truth,

11  testified on his oath as follows:

12                    <u>DIRECT EXAMINATION</u>

13  BY MS. LINDAUER:

14      Q.   I do apologize for mispronouncing your last name.

15       Could you state your full name for the record.

16      A.   Jose Manuel Potela, Jr.

17      Q.   And, Mr. Potela, how are you employed?

18      A.   I'm a partner at the Beckham Group.

19      Q.   And do you hold any licenses or certifications?

20      A.   I'm a lawyer.

21      Q.   Okay.  And how long have you practiced law?

22      A.   14 years at this point.

23      Q.   And were you retained in this case as special

24  counsel?

25      A.   I was.

 1      Q.    And for what particular issue were you retained?

 2      A.    In relation to the potential dispute with the

 3  insurance company regarding payment of the insurance claim

 4  relating to the damage which occurred to this property.

 5      Q.    Okay.  And in that role, have you been involved in

 6  the adversary proceeding that was filed regarding the claim

 7  for insurance proceeds?

 8      A.    I have.

 9      Q.    And that's pending in this court as an adversary

10  proceeding; is that correct?

11      A.    It is.

12      Q.    Now, Mr. Potela, your involvement with this

13  property actually goes back before your employment as special

14  counsel; is that correct?

15      A.    Yes, ma'am.

16      Q.    And when did you first get involved with this

17  property?

18      A.    I am not sure of the date.  I would say roughly

19  about a year before it went into bankruptcy.

20      Q.    All right.  And that would have been in the Spring

21  of 2011; is that right?

22      A.    Roughly.  I'm not certain of the date.

23      Q.    All right.  And why were you involved in the, let's

24  say the Spring or Winter of 2011?

25      A.    There -- well, my firm was engaged by Dhillon Group

1   to deal with and pursue litigation, if necessary, against the

2   insurance company for bad faith insurance claims handling,

3   things of that nature.

4       Q.   And was there, Mr. Potela, any delay in receiving

5   insurance monies related to the damage at the hotel?

6       A.   Significant.

7       Q.   And why was there significant delay?

8       A.   The insurance company, by the time my firm was

9   hired, I think had already been investigating the claim for

10  several months and had not -- they made some initial payment

11  for just the, I forget what that's called, removal work that

12  was done, but was not paying any money at that point for the

13  repair.  I think they had submitted a, they claimed the whole

14  thing could be repaired for, I think it was a couple of

15  hundred thousand dollars.  And obviously there was a

16  significant dispute over the total amount of repairs that

17  were need -- the dollar amount that was needed, and the

18  insurance company was doing what insurance companies do.

19      Q.   All right.  And as a result of that delay, was the

20  hotel -- was the hotel closed down as soon as the damage

21  occurred at the hotel?

22      A.   Yes.  It was a major leak.  This was actually on

23  Super Bowl Weekend when we had that real horrible freeze here

24  in Dallas.  A pipe burst that -- and I've been to the

25  location to see the damage.  But it -- a bunch of water

1  ruining multiple floors, multiple rooms.  Elevators stopped

2  working.  So, yes, it shut it down.

3      Q.   All right.  And the hotel has remained shut down

4  since that time; is that correct?

5      A.   Yes, because there's been no -- I think there's a

6  repair proceeds issue at this point.

7      Q.   Okay.  Something else happened also besides just

8  the delay in getting the insurance proceeds.  Did anything

9  happen with the actual proceeds themselves?

10     A.   Yes.  When my firm became involved, we were able to

11  negotiate a partial payment for the repairs.  I think the

12  amount was approximately $400,000.  And I'm not sure of the

13  number.  100,000 of that was slated to go to Belfor to pay

14  Guthrie, the two different companies, for the elevator

15  repair, even though the elevators had not been fixed at that

16  point.  And then the other 300,000 was slated for actual

17  repairs to the hotel.  And then we met with the Bank.

18  Mr. Dhillon -- I did not represent Mr. Dhillon, but he was

19  there and met with Ms. Crystal Howard and Ms. Worsham.  And

20  an agreement was reached where the proceeds were given to the

21  Bank to hold on to.  And the Bank had -- and the Bank would

22  make them available for repairs.  And they just insisted that

23  they be able to monitor the repairs that transpired at that

24  time.  And I don't remember the date of that meeting at the

25  Bank's offices.  I just remember who was there and what was

1    said.

2        Q.   And then what happened after that meeting with the

3    Bank?

4        A.   Well, repairs were attempted to be started.   One

5    problem is still the elevators were an issue.   And getting

6    Guthrie out there was a problem.   And then the biggest

7    problem that happened, I think, was the Bank started to

8    refuse to allow the funds to be used for repairs or anything

9    relating to repairs.   For instance, I think the electricity

10   got cut off out there which automatically stopped all

11   repairs, even though the Bank -- it was requested of the Bank

12   that the funds be used to allow the electricity to continue,

13   to allow the repairs to continue.   So I would say there was

14   difficulty between Dhillon Group and the Bank on the Bank

15   following through with its commitment that was reached when

16   those funds were deposited with the Bank.

17       Q.   Have any of the funds that were deposited with the

18   Bank been used for repairs to the hotel, to the best of your

19   knowledge?

20       A.   I'm not aware of what they've done with those

21   funds.   I think a small amount was paid to my firm to

22   continue with the insurance company, pressing them to get

23   money in.   Because that was to everyone's benefit; Bank's,

24   Dhillon Group's.   I don't know if they -- I don't know if

25   they cut any other checks.   I know some were requested and

1  they refused, but I don't know if they actually cut any.

2      Q.    But since your involvement on the insurance

3  proceeds issue, there hasn't been significant, as far as you

4  know, significant work done to the hotel to repair the hotel;

5  is that a fair statement?

6      A.    I don't know that that's accurate.  I believe that

7  Mr. Dhillon as a result of the commitment made by the Bank

8  that it would make those funds available for the repair, I

9  believe he did, in fact, begin repairing the hotel at that

10  point based on the representation that there would be money

11  from those insurance proceeds available.  And I think it was

12  pretty significant, from what I recall.

13      Q.    But as far as you know, the money didn't actually

14  get paid out then?

15      A.    That's right.  That's right.

16      Q.    Did the Bank have an explanation to you as to why

17  the monies were not paid out?

18      A.    I don't know as I sit here today that the Bank ever

19  explained why it didn't follow through on its agreement.  It

20  just took the position that those were funds that the Bank

21  had a lien on and, therefore, it didn't matter.  That was the

22  Bank's money.  And they weren't going to let it be used.

23      Q.    Now, the total of that number at this point is

24  somewhere in the neighborhood of $650,000; is that correct,

25  or more?

 1     A.   I'm not sure what number you're referring to.

 2     Q.   The monies that are actually still being held

 3   related to those repairs.

 4     A.   I believe there was a check deposited and that was

 5   in this court for 345,000.  I believe there was another check

 6   deposited for roughly 117,000.  And then initially there was

 7   another check, this was the one at the meeting where we met

 8   at before bankruptcy was filed that I think was 300,000.  So

 9   I think the number, total number that was deposited with the

10   Bank was around 800,000, or something.  And I think they,

11   some of the funds to the tune of either 50,000, less than

12   100, I believe, were used -- I don't know what the Bank -- I

13   don't know what the Bank did with it.  But that's what I

14   believe was deposited with the Bank total.

15     Q.   All right.  Now, the remaining insurance proceeds,

16   there's only one remaining claim; is that correct, at this

17   point?

18     A.   No.  That's not accurate.

19     Q.   All right.  Tell me what claims were made.

20     A.   Okay.  So there's -- and I'll lump these in.

21   There's the claim for the repairs from the damage from this

22   frozen pipe.  And then there's also apparently a claim that

23   I'm not involved in, I just have awareness of it, for some

24   roof damage to the hotel.

25     Q.   Okay.  And do you have any idea what the total of

NATIONAL COURT REPORTERS (214) 651-8393

1   those claims would be at this point?

2        A.   The dollar amounts of those claims?

3        Q.   Correct.

4        A.   Well, arguably there's an argument under the Bad

5   Faith insurance Code that you would look towards the

6   insurance company for loss of profits for not providing that

7   money and allowing this company to get operating.  So there's

8   a legal argument for, I believe, several million dollars.  I

9   think that the, if you're just talking about repairs dollars

10  that the insurance company would owe, setting aside the roof,

11  which I don't know the answer to because I'm not involved in

12  that, the parties are in negotiation.  And I think you've

13  stated the number roughly earlier of 200,000.

14       Q.   So that would be in addition to the monies that the

15  Bank is already currently holding; is that correct?

16       A.   Yeah.  That would be a future payment from the

17  insurance company.

18       Q.   Okay.  And do you have any idea, Mr. Potela, what

19  the timing is on resolving that litigation and that $200,000?

20       A.   I think it could be fairly soon.  The issue was,

21  and there's a pending motion before this Court with an order

22  on it, we were going to meet, but then this hearing is

23  happening.  And, perhaps, depending upon how this hearing

24  goes, it could change the dynamic of the negotiation.

25       Q.   If you look at Exhibit Number 9 in the numbered

NATIONAL COURT REPORTERS (214) 651-8393

1   binder.

2        That's an agreed order that the parties signed off on,

3   which did allow for two checks, you mentioned, to be paid

4   over to UCB to be held actually in their lawyer's trust

5   account; is that correct?

6        A.   Yes.  This represents the proceeds, the 345 does,

7   of what I was already able to negotiate on behalf of Dhillon

8   Group to go into the court.  And I believe the 117 was

9   actually a replacement of a stale check, possibly.

10       Q.   Okay.  There was an issue raised in one of the

11   objections about a stale check.  And that was replaced and

12   there are good funds and those were deposited with UCB; is

13   that correct?

14       A.   That's my understanding what the 117 was.  That

15   would be the amount that Belfor is supposedly going to pay

16   Guthrey for the non-completed repairs that Guthrey did out at

17   the site.

18       Q.   And, Mr. Potela, to the best of your knowledge, is

19   there a dispute with some of the insurance companies, Belfor,

20   people like that, some of the people that did do work out

21   there regarding the completion of their projects?

22       A.   Certainly, especially on this 117,000.  There was a

23   dispute that Guthrey did not complete the elevator work.  And

24   the elevator work is kind of quintessential to being able to

25   do -- first of all open the hotel, you've got to have them

1    running.  But also for the repairs so that they can get

2    supplies and whatnot up and down through the elevator.  There

3    was also an issue as it relates to Guthrey in that Dhillon

4    Group did not select Guthrey.  They wanted to use another

5    elevator company.  But the insurance company, Mr. Banano,

6    insisted that Dhillon Group use Guthrey.  And we question

7    whether or not there's some sort of relationship there

8    between Belfor and the insurance company or Guthrey and the

9    insurance company.  And, therefore, we said that the

10   insurance company is responsible for the delays and

11   deficiencies of the subcontractor, since that subcontractor

12   was forced upon us.

13              MS. LINDAUER:  Okay.  Your Honor, at this time

14   I would pass the witness.

15                    CROSS-EXAMINATION

16   BY MS. WORSHAM:

17       Q.   Mr. Potela, I'm Laura Worsham, as you know.

18        Do you also represent Dr. Sony?

19       A.   I do.

20       Q.   And Dr. Sony is, what, a third principal in the

21   debtor?

22       A.   He's an equity holder and a creditor, I believe.

23       Q.   He's an equity holder in what percentage?

24       A.   I believe one-third.

25       Q.   Okay.

1          MS. WORSHAM:  May I approach the witness with

2   the stipulations that we admitted a few minutes ago?

3          THE COURT:  You may.

4     Q.   Mr. Potela, regarding stipulation number 2, I

5   believe that's a chart setting forth the amount that's been

6   paid on the insurance claims regarding the property in

7   Sherman; is that correct?

8     A.   Can you give me a second to look at it?  I haven't

9   seen this before.

10      Okay.  I'm sorry, can you ask your question again?

11    Q.   Does that stipulation number 2 set forth checks

12  that were payable as a result of the property loss on the

13  Sherman hotel?

14    A.   I believe so.  But I also believe it is missing the

15  replacement check that was deposited with the Bank.  I don't

16  see the replacement check on here.

17    Q.   Okay.  Other than that, is that the best of your

18  knowledge the checks that have been paid on the claims?

19    A.   I think so.

20    Q.   So the loss was in February of 2011; would you

21  agree with me on that?

22    A.   Right.  Super Bowl Weekend.

23    Q.   So the first five checks were paid out by March

24  16th of 2011.  And you can check my math, but those checks

25  total $846,374 that was paid out in roughly the first five

1   weeks since the loss; is that correct?

2       A.   No.   If you're talking about the first four numbers

3   on here, that would be roughly 700,000.

4       Q.   It's 150,000 for February 24th.   That was a typo

5   that we corrected.   I'm sorry, I might not have corrected it

6   on your's.

7       A.   Okay.   There was a zero drawn underneath.   Your

8   question again?   I'm sorry.

9       Q.   So the checks that were paid out in the first four

10  to six weeks after the loss total $846,374 to paid by

11  Security Insurance; is that correct?

12      A.   From the exhibit that you've produced to me, I

13  believe that math is correct.

14      Q.   Okay.   Anywhere on the payees do you see United

15  Central Bank's name on the first four checks that were paid?

16      A.   On this exhibit, no.

17      Q.   Okay.   So United Central Bank was not a payee on

18  any check from the insurance company until September of 2011;

19  is that correct?

20      A.   According to this exhibit, that's correct.

21      Q.   Do you know any different from the exhibit?

22      A.   I don't know one way or the other.

23      Q.   Okay.   But you're in charge of the insurance

24  proceeds for the estate.   You're special counsel and you

25  don't know the status of the checks?

NATIONAL COURT REPORTERS (214) 651-8393

1       A.   I don't believe that's the question that you asked

2   me.  I think what you asked me was, these four checks before

3   I was hired by Dhillon Group, or before I was hired by

4   special counsel, do I know whether or not those had the Bank

5   on them as payees.  And my answer is, I don't know.

6       Q.   Okay.  Do you know if all $846,000 of that money

7   went into repairs on the Sherman property?

8       A.   I know there's a check here -- and you've got to

9   remember that there's a couple of things that the insurance

10  company was paying on that time.  Not just repairs, but also

11  for --

12      Q.   I'm just talking about the checks that are

13  listed --

14      A.   So am I.

15        So I believe the 150,000, the one you have on 2/24/11,

16  I believe that was an advance on the loss of business

17  interruption.  So that was not for repair.  I believe the

18  check on 3/16/11 for $327,897 was a check to pay Belfor for

19  the -- and I'm forgetting the construction term.  It's not,

20  it's when they go in and just tear out stuff.  So I don't

21  know if that's --

22      Q.   Restoration?

23      A.   Restoration, there you go.

24      Q.   But that related to the property?

25      A.   Absolutely.  Yes, that's right.  So that was for

1  Belfor and paid to Belfor for the restoration.  Then there's

2  332, now that is for, I believe, subsequent -- because it

3  says, Assuming your note here is correct for building ACV

4  loss, that was for subsequent -- that's true repair money for

5  repairs rather than restoration.  And then you can see from

6  your own notation on the 36,306, that's for business income,

7  not for repairs.  So the only amount in there, if you

8  separate out restoration from repair, is $332,000.

9      Q.    And can you testify that all $332,000 of that money

10  went into repair of Sherman?

11     A.    Oh, no, I'm certain it didn't, because I know at

12  least over 100,000 of it, I believe, went to the Bank for

13  payments of the mortgage.

14     Q.    In March of 2011?

15     A.    Over the time -- are you asking me on that date did

16  they use that entire amount for repairs?  The answer is, no.

17     Q.    Okay.  Then if you look down on the next -- the

18  bottom two checks there's an amount for 117,000.  That's the

19  amount for -- that arguably Belfor was claiming for insurance

20  proceeds; is that correct?

21     A.    On behalf of Guthrey, I believe that's correct, for

22  unpaid -- the unpaid balance.

23     Q.    So somebody else is claiming that money besides

24  United Central Bank, regardless of whether you and I believe

25  we have first rights to that money; is that correct?

 1     A.     Yeah.  I think there's a claim on file in this

 2  court for that money.

 3     Q.     Okay.  So the first check that had United Central

 4  Bank as the payee was in September of 2011?

 5     A.     Once again, I don't know who the payees were on the

 6  first four checks.  I do know once my firm got involved on

 7  those subsequent checks starting in 9/12/11 that the Bank was

 8  a payee.

 9     Q.     And did you ask the Bank to pay other bills not

10  related to repairs?

11     A.     I don't know the answer to that.  What --

12     Q.     Did you ask the Bank to pay your electricity bill

13  at the property?

14     A.     I've already said that, yes.  And not mine, Dhillon

15  Group's.

16     Q.     Did you ask the Bank to pay the insurance policy

17  for the property?

18     A.     I believe so.

19     Q.     Regarding the money that's held, would you disagree

20  with the fact that there's $216,000, roughly, held at the

21  Bank as a result of those proceeds?

22     A.     I wouldn't know one way or the other on that one.

23            MS. WORSHAM:  May I have a moment, Your Honor?

24            THE COURT:  You may.

25     Q.     We had posted the property for foreclosure prior to

1    the bankruptcy; is that correct?

2        A.   I believe so.

3        Q.   Do you recall having any conversations with the

4    Bank or myself about what money it would take to postpone the

5    sale?

6        A.   Postpone the sale, foreclosure?

7        Q.   Yes.

8        A.   I think we're talking about some time in the last

9    year.  I'm not clear on that.  It may have -- I'm not saying

10   it didn't happen.  I just don't recall any details of it.  I

11   remember on the electricity bill that the Bank said, Well,

12   we'll pay, I think it was $13,000 on the electricity bill.

13   But the Bank was demanding like $39,000 be paid to the Bank

14   out of those proceeds that the Bank was holding.  I remember

15   that discussion that -- but I don't know that I -- I don't

16   recall.  There may have been another discussion about the

17   foreclosure issue.  I don't recall.

18       Q.   Did you believe at that particular time in November

19   of 2011 you could get $5 million for the property on the

20   short sale?

21       A.   I don't know that -- I don't think I was involved

22   in that, Ms. Worsham.  I may have forgotten.

23              MS. WORSHAM:  Pass the witness, Your Honor.

24              THE COURT:  Redirect?

25              MS. LINDAUER:  No further questions of this

1    witness, Your Honor.

2                    THE COURT:  The witness may step down.

3                    MS. LINDAUER:  Your Honor, at this time I

4    would call Roger Pate.

5                    (The witness was sworn by the courtroom deputy.)

6                           ROGER PATE

7     The witness, having been duly sworn to tell the truth,

8    testified on his oath as follows:

9                       DIRECT EXAMINATION

10   BY MS. LINDAUER:

11       Q.   Mr. Pate, would you please state your full name for

12   the record.

13       A.   Roger Pate.

14       Q.   And, Mr. Pate, you've previously testified in this

15   court in connection with United Central Bank's motion for

16   relief from stay; is that correct?

17       A.   That is correct.

18       Q.   Okay.  And do you have a business, Mr. Pate, that

19   you operate?

20       A.   Yes, I do.

21       Q.   And what's the name of your business?

22       A.   Pate (indecipherable word) Company Incorporation.

23       Q.   And what does your business do?

24       A.   I build hotels.

25       Q.   And are there a particular type of hotels that you

1  primarily build?

2      A.   I primarily build the Holiday's, Hilton's, and the

3  Marriott's.

4      Q.   And are you familiar with the requirements for the

5  Holiday Inn, as far as their franchise requirements?

6      A.   I have built around 14 Holiday Inn properties.

7      Q.   And are you familiar with the Holiday Inn property

8  in Sherman that's the subject of this particular case?

9      A.   Yes, I do.

10     Q.   Okay.  And how are you familiar with that property?

11     A.   Dhillon Group told me to give an estimate to repair

12  the property and to get it approved by Holiday Inn to open as

13  a Holiday Inn Express.  So I went there.  I checked the

14  damages.  And I proposed them how much it would cost to

15  repair it.

16     Q.   Okay.  And had you had any involvement with this

17  hotel prior to the request for you to go and estimate the

18  repairs for the hotel?

19     A.   No.

20     Q.   And have you had any business dealings with

21  Mr. Dhillon prior to this particular hotel?

22     A.   Yes.

23     Q.   And what types of business dealings have you had

24  with Mr. Dhillon?

25     A.   We have common friend.

1      Q.   Okay.  All right.  And have you ever done business

2  with him before?

3      A.   Yes.  I build a hotel in 2008 and sold it to him.

4      Q.   Okay.  And which hotel was that?

5      A.   Holiday Inn.

6      Q.   Okay.  And where was that located?

7      A.   Fort Worth, Texas.

8      Q.   And where was that one located?

9      A.   4635 Gemini Place.

10     Q.   Okay.  And is that hotel still opening and

11  operating?

12     A.   Yes.

13     Q.   All right.  Now, you mentioned that you have quite

14  a bit of experience with the Holiday Inn requirements; is

15  that right?

16     A.   I opened the first three Holiday Inn Expresses in

17  the whole system.

18     Q.   Okay.  And where were those located?

19     A.   Missouri.

20     Q.   So the Holiday Inn Express is different than the

21  full service Holiday Inn?

22     A.   That is correct.

23     Q.   And this one in Sherman is a Holiday Inn Express?

24     A.   That is correct.

25     Q.   When was the last time you were out at this

1  property?

2       A.   After the Holiday Inn quality inspection.

3       Q.   Okay.  And when was that?

4       A.   Last week.

5       Q.   Last week?

6       A.   Uh-huh.

7       Q.   Okay.  So you've been out there very recently?

8       A.   Yes.

9       Q.   What's the current condition of the hotel?

10      A.   Same as before.

11      Q.   So it's just basically sitting there?

12      A.   Right.

13      Q.   Okay.  No new work that's been done out there?

14      A.   No.  I just checked all of the entries, all the

15  entrance to the hotel and everything is secured.

16      Q.   Okay.  Is the overall -- other than needing to be

17  repaired, is the overall condition of the hotel still good at

18  this time?

19      A.   It is.

20      Q.   Okay.  And that's not a very old property, is it?

21      A.   No, it isn't.

22      Q.   And as far as you can tell are all of the

23  facilities still there; the mattresses, the beds, the

24  dressers, all of that stuff is still there?

25      A.   Everything is in very good condition.

1    Q.   So it just needs to be put back together?

2    A.   Yes.

3    Q.   Okay.  Now, if we look at -- there's a notebook in

4  front of you with numbers in it.

5         If you'll look at Tab Number 2, which was the plan.

6         Do you have that?  And if you flip through to the back

7  of Number 2 to an Exhibit A.  If you can find that, that's an

8  email from you actually to me, Mr. Dhillon, and Mr. Ungerman.

9         Do you see that?

10   A.   Yes, I do.

11   Q.   Okay.  And is that an email that you prepared?

12   A.   Yes, I did.

13   Q.   Okay.  And this sets out some renovation costs,

14  investments, and how much you've agreed to also invest in

15  this program; is that correct?

16   A.   That is correct.

17   Q.   And you estimated the total renovation cost of

18  595,491.30; is that correct?

19   A.   That is correct.

20   Q.   Is that still a good figure today?

21   A.   That is.  But that is also additional,

22  approximately around $12,380 on top of.

23   Q.   Okay.  And we'll get to that in just a second.

24        All right.  So the 595,491, what would be involved in

25  the expenditure of that amount of money?  What would happen

1  with the hotel if that amount of money were spent?

2      A.   The hotel will open for the first guest in 90 days

3  after the Holiday Inn inspection.

4      Q.   Okay.  Can that be done any quicker than 90 days?

5      A.   It could be, but cannot be promised.

6      Q.   Okay.  The goal would be to open it as quickly as

7  possible; is that correct?

8      A.   The real hiccup is the carpet, because no

9  (indecipherable few words) or China will guarantee the

10  delivery of carpet.

11     Q.   All right.  And do you know if the carpet has

12  already been ordered or not?

13     A.   I have no idea.

14     Q.   Okay.  I would suspect not.  But the total

15  renovation costs then includes an investment by Mr. Dhillon,

16  do you see that, of 345,000?

17     A.   That is correct.

18     Q.   Okay.  And then a loan that you're personally

19  making, or your company is making to Mr. Dhillon of 249,000;

20  is that correct?

21     A.   That is correct.

22     Q.   Okay.  And are you still intending to make that

23  loan?

24     A.   That is correct.

25     Q.   That will not be an obligation of the debtor, that

1  will be a personal obligation of Mr. Dhillon?

2       A.   Only if I do the repairs.

3       Q.   Right.  Right.  That's part of your agreement to do

4  the repairs?

5       A.   That is correct.

6       Q.   All right.  And you believe that you will be able

7  to do the repairs as required by the Holiday Inn; is that

8  right?

9       A.   It will be approved by Holiday Inn.

10       Q.   All right.  And you know what is required for that?

11       A.   That is correct.

12       Q.   Okay.  Do you know if Mr. Dhillon has already put

13  up his 345,000?

14       A.   I don't have any idea.

15       Q.   Okay.  All right.  Now you mentioned in addition to

16  these amounts that there would be an additional amount of

17  about $12,000; is that correct?

18       A.   That is correct.

19       Q.   Okay.  If you turn to Exhibit 16.

20        And, sir, did you prepare Exhibit 16?

21       A.   Yes, I did.

22       Q.   Okay.  And are these the additional items that

23  Holiday Inn would require in order for the hotel to reopen?

24       A.   Mr. Stanley Jones with Holiday Inn Quality Control

25  Department, he did inspection.  And I had received an email

1   from Jag Dhillon that would -- which originated from

2   Mr. Stanley Jones.  And I reviewed that email and I went back

3   to the property and I prepared this estimate.

4        Q.   Okay.  And when did you actually prepare this

5   estimate?

6        A.   31st, May 31st.

7        Q.   Okay.  So just within the last few days?

8        A.   Yes.

9        Q.   Okay.  And these would be what you mentioned, the

10  additional items that Holiday Inn would require in order to

11  reopen the hotel?

12       A.   That is correct.

13       Q.   Okay.  So this is in addition to the 595?

14       A.   595, that is correct.

15       Q.   All right.  All right.  And between the renovation

16  costs and the investment by Mr. Dhillon and the $12,000, do

17  you know if Mr. Dhillon has put up sufficient funds to make

18  all of those payments?

19       A.   He might have.  I'm not aware of it.

20       Q.   Okay.  He would know?

21       A.   Yes.

22       Q.   Okay.  All right.  Are you willing to pay, put in

23  any more than the 249,928?

24       A.   Depends.  If it is necessary, I would.

25       Q.   Okay.  Would you be willing to put in the extra

NATIONAL COURT REPORTERS (214) 651-8393

1   $12,000?

2        A.   I can.

3        Q.   You can put that in?

4        A.   That is correct.

5        Q.   If it is needed, you would put it in?

6        A.   Yes.

7        Q.   All right.  And, Mr. Pate, once the repairs are

8   done, do you envision this being an up and operating hotel at

9   that point?

10       A.   That is correct.

11       Q.   And how is this hotel positioned in this particular

12   market, the Sherman market, versus, perhaps, other hotels in

13   that area?

14       A.   Holiday Inn Express as a whole has pretty much no

15   competition.  It's hotel by itself.  It's very popular.  And

16   if you consider competition, the only hotel that can compete

17   with Holiday Inn Express will be Hampton Inn and Fairfield

18   Inn.

19            MR. ALLEN:  I'd have to --

20            THE COURT:  I need you to speak into the

21   microphone.

22            MR. ALLEN:  I'm sorry.  Your Honor, I'm going

23   to have to object to this witness testifying as an expert on

24   the value or the economic viability of this Holiday Inn in

25   Sherman, Texas.  He's not listed as an expert who's going to

 1   testify as to those types of things at this hearing.

 2              MS. LINDAUER:  Your Honor, I'm not going to

 3   ask him about the value of the hotel.  I'm just asking him

 4   about how it's positioned in the marketplace.  And I was

 5   getting into what is its competition in the area.  What other

 6   hotels are in that area, so the Court gets a picture of how

 7   this hotel is positioned versus perhaps other one's.  So I'm

 8   not going to ask him about the value of the hotel.

 9              MR. ALLEN:  I would still think that would be

10   expert opinion, Your Honor.

11              THE COURT:  Objection sustained.

12       Q.   Mr. Patel -- Mr. Pate, what other hotels are

13   located in the same vicinity as this hotel?

14       A.   There are several hotels.

15       Q.   Okay.  Are there any as nice as the Holiday Inn

16   Express?

17       A.   No.

18       Q.   What would be the nearest nicest competition for

19   this hotel?

20       A.   Another Holiday Inn Express in the next town.

21       Q.   Okay.  And which town is that?

22       A.   I don't remember.  But I went back to check it out.

23       Q.   Okay.  But there are no other Holiday Inn's in

24   Sherman, Texas; is that correct?

25       A.   No.

1      Q.   All right.  And is this one located right on the

2  highway as you --

3      A.   That is correct.

4      Q.   And were you familiar with the operations of the

5  hotel prior to the damage in the Spring of 2011?

6      A.   No, I was not.

7      Q.   So your involvement has solely been since the time

8  of the damage to date?

9      A.   That is correct.

10     Q.   Okay.  Mr. Pate, do you have enough confidence in

11  this particular property that you believe that you will be

12  repaid the monies that you would advance to assist with the

13  repairs?

14     A.   It might take some time for me to get my money.

15  But I know that's a possibility.

16     Q.   Okay.  What are the major repair items that are

17  still left to do at that property today?

18     A.   Carpet is the main.  And other than that, there is

19  nothing major.

20     Q.   Okay.  And as far as the furniture is still there;

21  is that correct?

22     A.   That is correct.

23     Q.   Okay.  So there's no need to buy additional

24  furnishings, is there, at this time?

25     A.   That is correct.

1      Q.    Okay.  So all of what will be done is structural in

2    the sense of carpet, paint, those types of things; is that

3    correct?

4      A.    That is correct.

5      Q.    Have all of the plumbing problems been fixed with

6    the hotel?

7      A.    Yes.

8      Q.    And are there any other mechanical problems,

9    air-conditioning, anything of that nature?

10     A.    No.  Air-conditioning system is working fine.  The

11   only thing is we're going to have to re-certify the fire

12   sprinkler system.

13     Q.    Is there anything else that will require

14   re-certification or City approval?

15     A.    Fire and elevator.

16     Q.    And how long does the City of Sherman normally take

17   to do those --

18     A.    They are very prompt.  You call them in the

19   morning, they'll be there by noon.

20     Q.    Okay.  So that's not going to be an issue?

21     A.    No.

22     Q.    Mr. Pate, are you familiar with Exhibit Number 11?

23   Those are the check lists from the Holiday Inn Express people

24   with regard to the Sherman, Texas property.

25     A.    That is correct.

1        Q.    All right.  The $12,000 bid, does that include the

2    items that are part of Exhibit 11?

3        A.    Yes, they are.

4        Q.    All right.  Are you aware of any additional Holiday

5    Inn or Holiday Inn Express requirements besides those that

6    either fall within the scope of your repairs, or the scope

7    the repairs that you put together in Exhibit 17?

8        A.    No.

9        Q.    And do you have a pretty -- you said you have a

10   pretty close working relationship with the Holiday Inn folks?

11       A.    That is correct.

12       Q.    All right.  And Exhibit 12, that was an estimate

13   for repairs also from INA Development & Construction.

14        Are you familiar with that particular bid for repairs?

15       A.    No.  I don't know them.

16       Q.    Okay.  Have you looked at that particular bid?

17       A.    I'm looking at it right now.

18       Q.    That bid is slightly higher than your bid; is that

19   correct?

20       A.    That is correct.

21       Q.    But only by about 10 or 15,000 is my estimate?

22       A.    That is correct.

23       Q.    Okay.  Are you familiar with INA Construction?

24       A.    No.  I don't know them.

25       Q.    And did you visit with them at all in their

1   preparation of their particular bid?

2       A.   No.

3       Q.   And, Mr. Pate, as you sit here today, do you stand

4   by your particular bid and the costs that will be incurred to

5   do those particular repairs?

6       A.   Can you repeat that?

7       Q.   Do you stand by your bid as being an accurate bid

8   in order to do the repairs at the hotel itself?

9       A.   Yes, I do.

10      Q.   If there are any cost savings as part of the

11  repairs that you anticipate doing, you would pass those

12  along, obviously, to the debtor; is that correct?

13      A.   That is correct.

14      Q.   Okay.  And who has been working with you primarily

15  on the repair issue?  Is there a particular person?

16      A.   Mr. Dhillon.

17           MS. LINDAUER:  Your Honor, I'll pass the

18  witness.

19           THE COURT:  Cross?

20           MR. ALLEN:  Yes, ma'am.

21           <u>CROSS-EXAMINATION</u>

22  BY MR. ALLEN:

23      Q.   Mr. Pate, as I understand, you're going to loan

24  200, roughly $250,000 to Mr. Dhillon to complete the repairs

25  of the hotel; is that correct?

1       A.   That is correct, sir.

2       Q.   If you will, tell the Court how you're going to be

3  repaid that money.

4       A.   I have a letter of credit.

5       Q.   A letter of credit?

6       A.   Line of credit from my bank.

7       Q.   No.  How you're going to be repaid by Mr. Dhillon

8  the $250,000.

9       A.   He will repay me personally.

10      Q.   And what is the arrangement for you to be repaid

11 personally?

12      A.   From the income that will generate.  Whatever he

13 makes.

14      Q.   Whatever he makes off that hotel?

15      A.   No.  Off all his hotels.

16      Q.   All right.  And how much is he supposed to pay you

17 on a monthly basis to retire this quarter of a million dollar

18 loan?

19      A.   We haven't agreed to (indecipherable word) of

20 repayment, because I don't have the contract yet.

21      Q.   Do you recall being under oath and testifying when

22 we were here on a motion to lift stay that you were going to

23 be repaid $8,000 a month by Mr. Dhillon?

24      A.   That was verbal.  I don't have anything in writing.

25      Q.   Well, when you told the Court that you were going

1   to be paid $8,000 a month by Mr. Dhillon, was that correct or

2   incorrect?

3       A.   That is correct.  And that was verbal.  And if I

4   get the contract, I'll do an agreement and have him sign and

5   notary it.

6       Q.   So if you get the contract and loan him the money,

7   you're going to have another agreement with Mr. Dhillon on

8   how he repays you, but you don't know what that is right now;

9   is that a fair statement?

10      A.   (Indecipherable word) here agreed on $8,000.

11      Q.   Have you agreed to accept $8,000?

12      A.   Depends, you know.  If I get the contract, I do.

13      Q.   Okay.  Now, let me ask you, you indicated -- let me

14  let you glance at Exhibit 11, which is in front of you,

15  please.

16       If you'll look at what would be the second page of

17  Exhibit 11.  There are -- there's a check list from Holiday

18  Inn; is that correct?

19      A.   Yes, it is.

20      Q.   And the check list has a series of columns.  And

21  one column it says, yes, and another column it says, no.

22       Do you see those columns?

23      A.   Yes.

24      Q.   And on the second page of Exhibit 11 there are, in

25  one column the word no, n-o, is circled a number of times.

1    And to the right of that circled, no, are a number of dates.

2         What is that?  Can you tell me?

3         A.    That is box springs, if there is a bed skirt on the

4    box springs.

5         Q.    Well, let me ask it this way.  Maybe that was

6    confusing.

7         Where it says, no -- the first item on the second page

8    of Exhibit 11 says, Certificate of occupancy.  And the word,

9    no, is circled.

10        Do you see that?

11        A.    That is correct.

12        Q.    And then to the right of that is the -- are the

13   letters 8/20/12.

14        Did you place that 8/20/12 on this Exhibit 11?

15        A.    No.

16        Q.    Who did?

17        A.    I have no idea.

18        Q.    Do you recognize that as Mr. Dhillon's handwriting?

19        A.    No.  I don't think so.

20        Q.    So you don't have any idea who circled no on

21   Exhibit 11, or who wrote to the right of either a, yes, or a,

22   no, the date, I guess an event was to take place?

23        A.    Mr. Dhillon is director of operations.

24        Q.    Uh-huh.

25        A.    He might have done it.

NATIONAL COURT REPORTERS (214) 651-8393

1      Q.    That is Mr. Dhillon as director of operations might

2    have done it?

3      A.    Yes.

4      Q.    All right.  Would you agree with me, then, looking

5    at Exhibit 11 -- and let's flip over to what would be page 4

6    of Exhibit 11.  And toward the bottom of page 4 there is a

7    column that says, wireless high-speed internet access

8    present.  And the word, no, is circled.  And to the right of

9    that it appears written 8/30/12.

10       Do you see that?

11     A.    Yes.

12     Q.    Is that, do you believe, the date that the wireless

13   connection is supposed to be present and up and running in

14   this hotel?

15     A.    Actually, when they start the renovation, that is

16   the first thing that will be on.  Because I need my

17   contractors to work there too.

18     Q.    I am talking, sir, about the wireless high-speed

19   internet access, I assume for the lobby, the entrance, and

20   the front desk, if you look at the page of Exhibit 11 that

21   I'm directing you to.

22     A.    That is correct.

23     Q.    Okay.  You're saying that's the first thing you'll

24   turn on when you go to the hotel?

25     A.    That is correct.

1     Q.   Okay.  How about -- if you'll go over to page 5 of

2     Exhibit 11.  Under Great Room/breakfast area, there are a

3     number of items marked -- circled, no, with dates to the

4     right of that, all 8/20/12.

5          Would it be your testimony here today that the wall

6     finishes would be completely installed in the Great Room and

7     the breakfast area by 8/20/12 at the hotel?

8     A.   It could be done before then.

9     Q.   But your testimony is it would take 90 days to open

10    this hotel; is that correct?

11    A.   Well, if the carpet is (indecipherable word) today,

12    it will take 45 days.

13    Q.   But you don't know if it's been ordered or not

14    ordered?

15    A.   No.

16    Q.   And you don't know whether it's on some loom in

17    China ready to be shipped to you or not, do you?

18    A.   That is correct.

19    Q.   How about the mold at the -- the mold requirements

20    at this Holiday Inn?  Do you know that Holiday Inn --

21    A.   I think the --

22    Q.   Just a moment.

23         Do you know that Holiday Inn has asked for some

24    re-checking of the mold at the Holiday Inn?

25    A.   That is correct.  It is a standard practice because

 1   Holiday Inn as a franchise, they very carefully check their

 2   hotels for the safety and security of their guests.

 3        Q.    Let me ask you this on the Holiday Inn.  What have

 4   you done to make it ADA compliant with the March, I think

 5   it's March of 2012 ADA requirements for hotels?

 6        A.    It's -- all you need is an ADA lift in the pool.

 7        Q.    Let me ask you this, is there an ADA lift in the

 8   swimming pool presently?

 9        A.    I don't think it is there.  But --

10        Q.    Have you ordered one?

11        A.    I think the director of operations told me that it

12   has been ordered and it has been (indecipherable word).

13        Q.    How about making the facility ADA compliant for the

14   hearing impaired?  Where's that in your bid?

15        A.    The hotel is already hearing impaired.

16        Q.    Do you know how many -- since you have the

17   background in this, for an 84 room hotel, how many hearing

18   impaired rooms must this hotel have?

19        A.    Nine.

20        Q.    And are there nine now?

21        A.    I think so.

22        Q.    Don't know, but you think so?

23        A.    Yes.

24        Q.    Are those nine located throughout the hotel, or one

25   room?

1    A.   They have -- according to ADA, there could be -- if

2    the hotel is open on or before, I think 2004 or 2006, I don't

3    remember the code, then they could be where they are.  But if

4    the hotel is open like tomorrow, then they have to be

5    scheduled all over the hotel.

6        Q.   Are you familiar with the first page of Exhibit 11

7    wherein Holiday Inn says, You need to get this hotel ADA

8    compliant?

9        A.   It's all of this.

10        Q.   It doesn't talk about grandfathering anything.  It

11   says, Make it ADA compliant; does it not?

12        Please look at the piece of paper.

13        A.   ADA compliance is always owner's responsibility.

14   It's never a franchise's responsibility.

15        Q.   Well, I think we're dealing with the owner,

16   Mr. Dhillon.  Has he made the -- this Holiday Inn ADA

17   compliant, according to the March 15th, 2012 requirements for

18   hotels?

19        A.   I think it should be already ADA.

20        Q.   But you don't know?

21        A.   No.

22        Q.   Okay.  How much does this lift cost?

23        A.   Right now it is around $1,800.

24        Q.   And did you have the Meacham Hotel in Fort Worth as

25   your hotel?

```
 1        A.   I bid that hotel in 2008.

 2        Q.   My question was, was it one that you owned and ran?

 3        A.   I opened it and then sold it.

 4        Q.   Okay.  While you were running the Meacham Hotel, am

 5   I correct that the lender of that hotel replaced you with a

 6   third-party management team?

 7        A.   I --

 8        Q.   Yes or no?

 9        A.   No.

10        Q.   No.  All right.

11             MR. ALLEN:  No other questions, Your Honor.

12             THE COURT:  Redirect?  Oh.

13             MR. LERNER:  I just have one very short

14   question about the mold.

15             CROSS-EXAMINATION

16   BY MR. LERNER:

17        Q.   Are you aware of a current mold certificate being

18   issued on this property stating that there's no mold on the

19   property?

20        A.   Yes.

21        Q.   Can you turn to Exhibit 13, please?

22         And can you identify for the Court what that document

23   is?

24        A.   This is the certificate of mold damage remediation.

25        Q.   And is that the certification that you were
```

1   referring to when you answered, yes, to me a few moments ago?

2        A.   That is correct.

3        Q.   What's the date on that -- on that document?

4        A.   The expiration is 3/17/2013.

5        Q.   And when was that document issued?

6        A.   July 29, 2011.

7        Q.   So it's almost a year old; is that correct?

8        A.   That is correct.

9        Q.   Are you aware of whether or not Holiday Hospitality

10   has asked for a more current or new mold remediation

11   certificate?

12       A.   If Holiday Inn is not asked, there should be soon a

13   new current certificate issued.

14       Q.   And have you made arrangements to get that

15   certificate issued?

16       A.   I will, if I get the contract to start the

17   construction.

18       Q.   Thank you.

19            MR. LERNER:  No further questions.

20                 REDIRECT EXAMINATION

21   BY MS. LINDAUER:

22       Q.   Mr. Pate, do you know if Mr. Dhillon has ordered a

23   new mold certificate on the property?

24       A.   I have no idea.

25       Q.   Okay.  All right.  So if he testifies to that

1   question, you're not aware of that situation?

2        A.   That is correct.  Because this was done before I

3   went to see the property.

4        Q.   All right.  If you turn to Exhibit 11 with me and

5   you look at the items listed, under the category, pool area

6   interior and exterior, do you see that list?

7             THE COURT:  What page?

8             MS. LINDAUER:  It would be page -- the page

9   numbers seem to be cut off, but it should be page --

10       A.   Yeah, I'm on that page.

11            THE COURT:  Okay.  I found it.

12            MS. LINDAUER:  Okay.  Thank you, Your Honor.

13       A.   Page 9.

14       Q.   Yeah.  Do you see anything on the Holiday Inn check

15   list there that says anything about having a lift?

16       A.   No, it isn't.

17       Q.   Okay.  It isn't on there.  In fact, all of the pool

18   items, save and except two or three, it looks like actually

19   just one in the pool area is marked, no, which is emergency

20   lighting present, everything else is marked, yes.

21       Do you see that?

22       A.   That is correct.

23       Q.   If there is a requirement of a lift, that's

24   something that the owner could easily install for the pool

25   area?

1        A.    That is correct.

2        Q.    Okay.  But it wasn't something that was

3   specifically listed on the list for the Holiday Inn folks; do

4   you see that?

5        A.    That is correct.

6        Q.    Okay.  And when you prepared your estimate, the

7   $12,000, that was following the specific things that the

8   Holiday Inn folks had asked be taken care of?

9        A.    That is correct.

10       Q.    Okay.  Which did not include that item?

11       A.    That is correct.

12       Q.    And just to be clear, Mr. Pate, your attachment

13   that went with the disclosure statement that we looked at,

14   that Exhibit A, which was your offer to make a loan to

15   Mr. Dhillon for 249,000 for your company doing the work out

16   there, it did provide that you would be paid back over 36

17   months by Mr. Dhillon personally with payments of around

18   $7,600; is that correct?

19       A.    That is correct.

20       Q.    Okay.  That's still your proposal to Mr. Dhillon;

21   is that right?

22       A.    Yes.  If I get the contract.

23       Q.    If you get the contract.

24        And you're willing to work with Mr. Dhillon to do this

25   project and then to rely on him personally to have to pay you

1  back; is that right?

2      A.   That is correct.

3      Q.   Okay.  You understand the debtor would not be

4  paying you?

5      A.   That is correct.

6      Q.   Okay.  You understand that.

7           MS. LINDAUER:  No further questions, Your

8  Honor.

9           THE COURT:  All right.  The witness may step

10 down.

11     Let's take a 10 minutes recess before you call your

12 next witness.

13               (Brief recess ensued.)

14          THE COURT:  All right.  We're back on the

15 record in the Dhillon Group, LLC case.  Case number 12-40163.

16     Ms. Lindauer, you may call your next witness.

17          MS. LINDAUER:  Your Honor, at this time I

18 would call Jag Dhillon to the stand.

19               (The witness was sworn by the courtroom deputy.)

20               <u>JAG DHILLON</u>

21  The witness, having been duly sworn to tell the truth,

22 testified on his oath as follows:

23               <u>DIRECT EXAMINATION</u>

24 BY MS. LINDAUER:

25     Q.   Mr. Dhillon, would you state your full name for the

1   record.

2       A.   Jagmohan F. Dhillon.

3       Q.   And for the record, could you spell your first

4   name?

5       A.   J-a-g-m-o-h-a-n.

6       Q.   And, Mr. Dhillon, what is your educational

7   background?

8       A.   Did my high school in India.  Then went for

9   college.  Then came to U.S. and went to college here in

10  California.

11      Q.   And when did you first come to the United States?

12      A.   In  1993.

13      Q.   And you said you went to college in California; is

14  that correct?

15      A.   Yes, ma'am.

16      Q.   And did you get any degree when you went to college

17  in California?

18      A.   No.  I did not get a degree.

19      Q.   Is there a particular area that you studied?

20      A.   Went for business classes and then I -- before I

21  finalized, I dropped out.  I did not -- I did not move

22  forward with that.

23      Q.   After you left college, did you go into any type of

24  business?

25      A.   Yes, ma'am.

1      Q.    What type of business?

2      A.    Gas stations, liquor stores.

3      Q.    And how long were you involved with gas stations

4   and liquor stores?

5      A.    Until 1998.

6      Q.    And then in 1998, what type of businesses did you

7   get involved with?

8      A.    In hotels.

9      Q.    And have you consistently since 1998 been involved

10  with hotels?

11     A.    Yes.

12     Q.    And in your involvement with hotels, has that

13  included owning hotels?

14     A.    Yes, ma'am.

15     Q.    And since 1998 approximately how many hotels have

16  you had an ownership interest in?

17     A.    I've bought and sold more than 30, 35 properties.

18     Q.    So 30 to 35 properties?

19     A.    Yes.

20     Q.    And have those been in any particular location in

21  the United States?

22     A.    They're in different states; Arizona, Utah, Texas,

23  Oklahoma, Kansas, Nevada.

24     Q.    And as of today, approximately how many hotels are

25  you still involved with?

1      A.    That would include 10 to 12 properties, managing

2    them.

3      Q.    And I'm sorry, what was your last comment?

4      A.    I manage 10 to 12 properties.

5      Q.    Okay.  And how many of those 10 to 12 properties do

6    you have an ownership interest in?

7      A.    Five to six properties.

8      Q.    And is one of the properties the property involved

9    in this bankruptcy case?

10     A.    Yes.

11     Q.    And I think you mentioned that you not only own the

12   properties, but you also manage them; is that correct?

13     A.    Yes, ma'am.

14     Q.    And is there a particular type of hotel property

15   you're primarily involved with, a particular brand?

16     A.    We own Holiday Inn's, Holiday Inn Express, Hampton

17   Inn, La Quinta's, some independents.

18     Q.    Okay.  So you said Holiday Inn full service,

19   Holiday Inn Express, Hampton Inn, and La Quinta's?

20     A.    Yes, ma'am.

21     Q.    Those are the main ones; is that right?

22     A.    Yes.

23     Q.    Okay.  And based on your experience, would you

24   consider most of those properties that either you manage or

25   you own to be more -- they're more the upscale type

 1   properties?

 2        A.   Yes.

 3        Q.   How does Holiday Inn and Holiday Inn Express fall

 4   with regard to quality of hotel properties?

 5        A.   They're a very fine -- they're good, they're strong

 6   in the ranking system.  And all of the properties have major

 7   renovation after 2008.  So they're all in the (indecipherable

 8   word) of Holiday Inn's that have been upgraded since 2008 and

 9   '09.  So that has a lot of good impact on the hotels.

10        Q.   All right.  And Holiday Inn is a respected quality

11   brand in the hotel business?

12        A.   Yes, very.

13        Q.   All right.  And the Holiday Inn Express is one of

14   their actually more current products that they've come out

15   with; is that right?

16        A.   Yes.  Most of the upstanding product they have.

17        Q.   And that's different than a Holiday Inn.  Holiday

18   Inn is the full service and the Holiday Inn Express is not

19   the full service; is that correct?

20        A.   Yes.

21        Q.   Now, the property in Sherman has been operated as a

22   Holiday Inn Express; is that correct?

23        A.   Yes.

24        Q.   And when was that property actually built?

25        A.   It was opened in 2006.

1       Q.    And when did you acquire that property?

2       A.    In mid 2007.

3       Q.    So it was about a year old when you bought it?

4       A.    Yes.

5       Q.    And how much did Dhillon Group pay for that

6    property when it acquired it?

7       A.    7.5 million.

8       Q.    And who provided the financing for that property?

9       A.    It was two lenders at that time.  It was Red

10   Capital and BMC Capital.

11      Q.    And was the property refinanced at a certain point

12   in time?

13      A.    Yes, in 2008.

14      Q.    And who acquired the loan in 2008?

15      A.    UCB, United Central Bank.

16      Q.    And how much was the original principal amount of

17   that loan from United Central Bank?

18      A.    Close to $6.4 million.  6.5, I'm sorry, 6.5.

19      Q.    And at the time that you financed the property with

20   United Central Bank, had Dhillon Group put about a million,

21   it looks like a little over a million dollars into that

22   property, is that --

23      A.    A million six.

24      Q.    A million six.

25       The million six that was put into the property when the

1  property was acquired, what was that used for?

2        A.   For the down payment.

3        Q.   And did it go to anything else?

4        A.   No.  It went for the down payment and part of the

5  loan from the bank.

6        Q.   So part of the cost to refinance the property also?

7        A.   Yes.

8        Q.   So UCB has had this particular loan now on its

9  books since 2008; is that correct?

10       A.   Yes.

11       Q.   Okay.  And up through 2011 had Dhillon Group made

12  payments to United Central Bank?

13       A.   Yes.

14       Q.   And was Dhillon Group current on its payments to

15  United Central Bank when the freeze happened in or about

16  February of 2011?

17       A.   They were, I would say, maybe 30 to 25 days, maybe

18  late.  But it was in 60 days bracket.

19       Q.   All right.  So you may have been like one month --

20       A.   Yes.

21       Q.   -- behind?

22        Now, there are some taxes that are also owed on the

23  property; is that correct?

24       A.   Yes.

25       Q.   Okay.  And how is it that the property did not pay

1   taxes for a couple of years?

2       A.   The payment with United Central Bank was 50,300 a

3   month.  And then I went to the Bank and requested it to

4   reduce.  And then when the downturn in the economy came in

5   2009 and '10, there was no other funds to pay for the

6   property tax.

7       Q.   And how much was the payment to United Central

8   Bank?

9       A.   50,300 something.

10      Q.   So the payment to United Central Bank was over

11  $50,000 a month?

12      A.   Yes.

13      Q.   And I think you mentioned that when the downturn in

14  the economy hit the hotel industry, 2009, 2010, you continued

15  to make your payments to the Bank, but you were not able to

16  make the taxes?

17      A.   Yes.

18      Q.   And that's how the taxes accrued?

19      A.   Yes.

20      Q.   Did you try to work out a loan modification with

21  United Central Bank?

22      A.   Many times.

23      Q.   Did you ever get a modification worked out with

24  them?

25      A.   I was promised, but it was never accomplished.

1      Q.    All right.   And so there was actually never an

2   actual written modification of the loan at any time; is that

3   right?

4      A.    After the hotel was shut down, then I went and I

5   requested them to (indecipherable word) down.   And that time

6   I think only one month or two months.   One month, something

7   like that, they let the payment go for one month only for the

8   month of February.   Then I had to restart it in March.

9      Q.    Okay.   But if you had to restart in March of 2011,

10  that was at a time when the hotel was actually closed; is

11  that right?

12     A.    Yes.

13     Q.    And obviously with the hotel closed, were you able

14  to continue to make the payment to United Central Bank?

15     A.    Yes.

16     Q.    Okay.   And did you make the payment for some period

17  of time?

18     A.    We made it until August or September.

19     Q.    And what happened in August or September that kept

20  you from making the payment?

21     A.    That time all the insurance funds were held with

22  the Bank and they asked if they can apply some of those funds

23  to the (indecipherable word) payment.   And I was okay with

24  that, since there was no funds at the property.   So then they

25  said, You know what, we don't want to.   We just want to go

 1    for foreclosure.  We don't want to deal with it.

 2         Q.   Okay.  So at some point the insurance monies that

 3    you received after February of 2011, part of that was applied

 4    to the loan with United Central Bank; is that correct?

 5         A.   Most of them.

 6         Q.   Most of it.

 7         A.   Yes.

 8         Q.   Okay.  And was that to try to keep the loan current

 9    then?

10         A.   Yes.

11         Q.   While the hotel was shut down?

12         A.   Yes.

13         Q.   Okay.  Now, Mr. Dhillon, you heard Mr. Potela's

14    testimony regarding the meetings with the Bank and the effort

15    to try to use the insurance money.  Was his testimony

16    accurate?  Was that your experience, also?

17         A.   Yes.

18         Q.   All right.  So the funds that Ms. Worsham has

19    mentioned that came in, some of the initial insurance monies,

20    those were used to maintain the loan with the Bank?

21         A.   Yes.

22         Q.   Did any of that money, Mr. Dhillon, go to a place

23    other than the Bank or to the hotel itself?

24         A.   No.  We have given accounting to the Bank already.

25    Everything that came in, there was past expenses, franchise

1    fees, (indecipherable word), and then Bank payments.

2         Q.    Did you take any of that money personally?

3         A.    No, I did not.

4         Q.    All right.  I think you mentioned that there was a

5    meeting in the Bank in the Fall of 2011 before the property

6    was posted for foreclosure and there was an effort to try to

7    work out the loan; is that right?

8         A.    Yes.

9         Q.    And that was not successful?

10        A.    No, it was not.

11        Q.    The Bank at the time, I think you just mentioned,

12   indicated to you that they would prefer to move forward with

13   foreclosure?

14        A.    Yes.

15        Q.    Mr. Dhillon, did the Bank at any time release any

16   of the insurance proceeds that it was holding for repairs for

17   the hotel?

18        A.    Earlier it was mentioned there was one check.  I

19   don't remember the amount of that check.  There was some

20   money released from the Bank.  It was to, I think, to pay

21   some bills for the hotel.  And then after that the Bank said

22   we don't want to release any more funds.

23        Q.    Did the Bank tell you why they wouldn't release any

24   additional funds?

25        A.    They said we just want -- we just want to move

1    forward.  You bring all cash to us to pay the loan off, or

2    we're not going to -- and my loan was, actually it was due in

3    May and they gave me four months extension.  And I was

4    promised I'll get another 12 month's extension from the Bank

5    after -- when they gave me four month's extension, I

6    requested four months -- give me at least one year 18 months.

7    They said, We'll give you four months right now.  I signed

8    that.  And then we'll give you another 12 months after

9    September.  But when September arrived, they denied that

10   request.

11        Q.   Okay.  And, Mr. Dhillon, why is it that you want to

12   try to hang on to this particular property at this time?

13        A.   We can -- this property (indecipherable few words)

14   with the proposal we have made, the future three years

15   there's some room to -- money we have invested can

16   (indecipherable few words) back.

17        Q.   Is there any way to pay your creditors, other than

18   through a plan that would retain this property?

19        A.   No.  The plan we have, that's the way that --

20        Q.   The purpose of the plan, obviously, is to try to

21   pay the creditors?

22        A.   Yes.

23        Q.   Okay.  And, Mr. Dhillon, you're aware there is a

24   dispute with insurance adjustors, Belfor, the Bank over some

25   of the insurance money; is that correct?

1      A.   Yes.

2      Q.   And there's a lawsuit pending as part of the

3  bankruptcy?

4      A.   Yes.

5      Q.   Okay.  And in connection with that particular

6  lawsuit, we've acknowledged that UCB does appear to have a

7  claim, a lien on certain of those insurance funds; is that

8  correct?

9      A.   Yes.

10     Q.   Their loan documents provide for that?

11     A.   Yes.

12     Q.   Okay.  Is there a dispute, Mr. Dhillon, over some

13 of the repairs that were being -- have been done or were

14 being done, and is that a reason some of the insurance money

15 has not -- was not released, for example?

16     A.   Yes.  That's what the whole thing -- the issue of

17 credit, since the money was not coming in, we started the

18 repairs and then we had to stop because the Bank won't

19 release any funds.

20     Q.   Okay.  So you started repairs.  The Bank wouldn't

21 release funds.  So you had to stop them.

22     I think there's some dispute over the completion of the

23 elevator work; is that right?

24     A.   Yes.

25     Q.   Okay.  Was the elevator work all completed at this

NATIONAL COURT REPORTERS (214) 651-8393

1  time?

2      A.   No.  It was never completed.  It was never fully

3  functional.

4      Q.   Okay.  So as we sit here today, does the elevator

5  actually work out there?

6      A.   No, it don't.

7      Q.   Okay.  So that has to be finished?

8      A.   Yes, ma'am.

9      Q.   Okay.  And that's part of, I think, some of the

10  insurance claims that have been made are to be paid for that

11  work and your dispute is that the work was not completed?

12      A.   Yes.

13      Q.   Okay.  Now, in the -- Mr. Pate in his bid for the

14  work, does it include finishing the elevator and making sure

15  that that operates?

16      A.   I don't remember that.  I will look at it.  But I

17  think since it was -- Belfor was dealing with it, so we left

18  it out for Belfor to --

19      Q.   Okay.  So you want Belfor to finish that particular

20  project if Mr. Pate has not included that?

21      A.   Yes.

22      Q.   But not Belfor.  It has to be Schindler Elevators.

23  That's what I recommended earlier when hotel was shut down.

24  At (indecipherable word) Schindler, they have installed those

25  elevators, the Schindler Elevators, so they know better.  But

1  the insurance company suggested they want to go with

2  different vendor.

3       Q.   Okay.

4       A.   And then that's where we are.

5       Q.   Okay.  I want to be clear.  Obviously the elevators

6  have to be operational for the hotel to be open?

7       A.   Yes.

8       Q.   And you understand that?

9       A.   Yes.

10      Q.   So if there's any dispute over how that gets taken

11  care of, then you or Mr. Pate will have to allocate funds to

12  make sure the elevator gets operational so you can open the

13  hotel?

14      A.   Yes.

15      Q.   Okay.  Mr. Pate also mentioned that the carpeting

16  is a big issue, getting the carpeting ordered and installed;

17  is that correct?

18      A.   Actually, I have contacted Snow White last year

19  when Bank said they would release funds for renovation.  We

20  have contacted them.  We have given them some deposit to

21  order the carpet.  But then when funds stopped -- they're

22  still holding some, I think, some dollar amount.  And they've

23  had -- they can deliver in 45, 50 days.

24      Q.   Okay.  So the carpet could come pretty quick?

25      A.   Yes.  And they have got approvals from Holiday Inn.

1        Q.    Okay.  And that's the carpet that Holiday Inn has

2   approved for use in the hotel?

3        A.    Yes.  It was approved, yes.

4        Q.    All right.  And the only thing that you're waiting

5   is to give them a final okay based on whether this plan is

6   approved or not?

7        A.    Yes.

8        Q.    Okay.  Obviously you're not putting your money in,

9   Mr. Pate is not putting his money in unless a plan is

10  approved by the Court?

11       A.    Yes.

12       Q.    In connection with that plan, you agreed with

13  United Central Bank that you would put certain funds up with

14  your attorney; is that correct?

15       A.    Yes.

16       Q.    How much have you actually deposited to date in

17  connection with this plan?

18       A.    Close to $400,000.

19       Q.    And I believe 47,000 of those dollars are allocated

20  toward taxes for current year; is that correct?

21       A.    Yes.

22       Q.    Okay.  And then the bulk of that 400,000, 350,000

23  of that is allocated specifically for repairs; is that right?

24       A.    Yes.

25       Q.    So your current plan does not rely on resolving any

1   dispute with insurance proceeds, payment of insurance

2   proceeds, any of that in order to reopen the hotel; is that

3   right?

4        A.   Yes.

5        Q.   And the some $350,000 that you've put up for

6   repairs, those are personal monies or loans that have been

7   made to you personally; is that correct?

8        A.   Yes.

9        Q.   The debtor is not required to repay those funds; is

10  that right?

11       A.   No.

12       Q.   And there's nothing in the plan that would require

13  the debtor to actually repay that?

14       A.   Yes.

15       Q.   Okay.  So similar to the funds that Mr. Pate has

16  agreed to advance also, you personally are responsible for

17  those?

18       A.   Yes.

19       Q.   Obviously it's your hope, I would think,

20  Mr. Dhillon, that in the next two or three years you would be

21  able to sell or refinance this property, pay off the Bank,

22  pay the creditors, and then hopefully operate it and some day

23  be able to pay back these monies; is that correct?

24       A.   Yes.

25       Q.   Okay.  But there's nothing in the plan right now

1  that commits to paying those funds back?

2      A.   Yes.  There's nothing in the plan right now.

3      Q.   All right.  After the plan is approved, if it is

4  approved, you then become the 100 percent owner of this

5  particular entity; is that correct?

6      A.   Yes.

7      Q.   Now, you have agreements with prior investors,

8  Dr. Sony, who was a prior investor, that you personally would

9  take care of Dr. Sony.  Again not a commitment through the

10 debtor; is that right?

11     A.   Yes.

12     Q.   Okay.  And so that's not part of your plan?

13     A.   No, it's not.

14     Q.   All right.  Let's specifically talk about what the

15 plan does call for.

16         If you'll look at Exhibit Number 2.

17         And, Mr. Dhillon, in order -- because this is operated

18 as a Holiday Inn Express, it's your plan to continue to

19 operate it as a Holiday Inn Express, correct?

20     A.   Yes.

21     Q.   So there will be no change of the franchise?

22     A.   No, no changes.

23     Q.   Okay.  And Mr. Ungerman mentioned that you've

24 worked out with the franchise company any fees that would

25 have to be paid, things of that nature; is that right?

1      A.   Yes.

2      Q.   Okay.  And because there's no actual change of the

3   ownership of the debtor, that you remain as the owner,

4   there's no requirement to get approval from Holiday Inn for

5   change of ownership, correct?

6      A.   Yes, that is correct.

7      Q.   Okay.  And that's important.  Because if there were

8   a change of ownership, then that trips some of their

9   concerns?

10     A.   Yes.

11     Q.   All right.  If we look at the actual classes of

12  creditors, if you look on page 7 of the plan, Class 1 are

13  allowed administrative claims; Class 2 are secured tax

14  creditor claims.  Those would be taxes that may be due for

15  year 2011, I believe, to the local taxing authorities; is

16  that correct?

17     A.   Yes.

18     Q.   Okay.  Class 3 is the TWC and Texas Comptroller.

19       Do you see that?

20     A.   Yes.

21     Q.   Class 4 is United Central Bank.  Class 5 is

22  Mr. Gyru (phonetic).  Class 6 is Mr. Dhami (phonetic).  Class

23  7 is Property Tax Lending.  Class 8 are the insurance

24  proceeds claimants.  Class 9 are unsecured claims.  Class 10,

25  I'm sorry.  Class 3 is not TWC or Comptroller.  Class 10 is

1   TWC and Comptroller.

2          Do you see that?

3          A.   Yes.

4          Q.   And then the last are the equity interest holders.

5          A.   Yes.

6          Q.   When this plan was filed and served out,

7   Mr. Dhillon, there was a provision that if there were any

8   issue raised with regard to the absolute priority rule, there

9   could be an auction of the equity in the debtor.

10          Are you familiar with that provision?

11          A.   Yes.

12          Q.   Okay.  Has anyone asked to bid against you for the

13   equity in the debtor?

14          A.   No.

15          Q.   So you're the only one that has offered to put up

16   money as part of this plan; is that right?

17          A.   Yes.

18          Q.   Okay.  And if somebody had asked to bid, they would

19   have had to have notified you seven days before the hearing

20   today and qualify, put up their money and all of that, and no

21   one has done that?

22          A.   Yes.  That is correct.

23          Q.   All right.  So your retention, or asked to retain

24   or acquire ownership is based on your putting up basically

25   new monies?

1      A.   Yes.

2      Q.   Okay.  And the new monies are the 300 -- well,

3   almost $400,000 that's been put up, and also your commitment

4   to repay Mr. Pate his some 249,000; is that right?

5      A.   Yes.  That is correct.

6      Q.   So the total equity contribution being made by you

7   is actually $649,000; is that right?

8      A.   Yes.

9      Q.   All right.  And then with regard to the treatment

10  of the creditors, we laid that out in the plan.  Let's focus

11  in particular on United Central Bank.  That's page 10, Class

12  4.

13       And if you look at subparagraph A under Class 4 on page

14  10, the actual calculation originally of the amount United

15  Central Bank was based on approximately $3,500,000, or such

16  amount as determined by the Court at the confirmation

17  hearing.  That amount would be paid with a 25 year

18  amortization.  And originally the interest rate was 1 percent

19  above prime and then 2 percent in years 2 and 3; is that

20  correct?

21      A.   Yes.

22      Q.   Now, we agreed --

23           THE COURT:  Okay.  Let me stop you.

24           MS. LINDAUER:  I'm sorry?

25           THE COURT:  Okay.  I'm going to stop you.

```
1                    MS. LINDAUER:  Sure.

2                    THE COURT:  Given the time, we're going to

3    take our lunch recess now.

4                    MS. LINDAUER:  Okay.  That's fine.

5                    THE COURT:  And then we have another matter on

6    the Court's docket.

7                    MS. LINDAUER:  Okay.

8                    THE COURT:  I think you all knew when we set

9    this that we had other matters on the calendar that we need

10   to take care of.  So we're going to take a recess now and

11   then we have our 1:00 docket.  So I'm going to excuse the

12   parties until 1:30.  But you have very limited time for the

13   balance of the day.

14                   MS. LINDAUER:  I understand.

15                   THE COURT:  And I don't need you to read from

16   the plan --

17                   MS. LINDAUER:  Okay.

18                   THE COURT:  -- and ask the witness if that's

19   what it says.  All we're doing is wasting time at that point.

20   If there's some point you want to make, make the point.

21                   MS. LINDAUER:  Okay.

22                   THE COURT:  You can use the rest in your

23   argument.

24                   MS. LINDAUER:  Okay.  Very good.

25                   THE COURT:  I'm going to excuse the parties
```

 1  until 1:30.

 2      Thank you.

 3           (Brief recess ensued.)

 4           THE COURT:  All right.  We're back on the

 5  record in the Dhillon Group, LLC.  Case number 12-40163.

 6  When we recessed Mr. Dhillon was on the witness stand.

 7      Mr. Dhillon, you understand you're still under oath?

 8           THE WITNESS:  Yes, ma'am.

 9           THE COURT:  You may proceed.

10           MS. LINDAUER:  Thank you, Your Honor.

11      Q.   Mr. Dhillon, you heard the questioning and the

12  testimony regarding 80(a) compliance.  What's the current

13  condition of the hotel with regard to 80(a) compliance?

14      A.   We were 80(a) compliant before we were shut and

15  we're still same.  Only thing we have to get the lift.  And

16  before we open, within 90 days we would have the lift.  It

17  will take two weeks to order and to be delivered.

18      Q.   Is that the only thing that we're missing?

19      A.   Yes, ma'am.

20      Q.   Okay.  And as far as mold remediation, have you

21  ordered a new mold remediation report?

22      A.   Yes.

23      Q.   Okay.  And when was that ordered?

24      A.   I think ten days ago I called the company.  So

25  within 30 days we'll have a report out.

1    Q.    Okay.  Is there any indication there should be any

2    problem with mold remediation?

3    A.    There should be no problem.

4    Q.    All right.  And then the other thing is is with

5    regard to yourself personally, did United Central Bank take a

6    judgment against you?

7    A.    I believe they did.

8    Q.    Okay.  And do you know for how much money?

9    A.    I think it was close to $9 million.

10    Q.    Is it related to a different property?

11    A.    Yes.

12    Q.    Okay.  And have you filed a request to have that

13    set aside?

14    A.    Yes.  I have.

15    Q.    So you filed a motion for new trial; is that right?

16    A.    Yes.

17    Q.    All right.  And that was included as an exhibit, as

18    one of your exhibits in this case; is that correct?

19    A.    Yes.

20    Q.    All right.  So you're disputing their deficiency

21    judgment or judgment, correct?

22    A.    Yes.

23    Q.    All right.  Is the fact that they may or may not

24    have a judgment against you, does that affect your ability to

25    put up the money that you've already put up?

1      A.   Yes.  I already deposited 400,000.

2      Q.   So you've already put up your money?

3      A.   I have put up the money, yes.

4      Q.   You've already put up your money in trust?

5      A.   Yes.

6      Q.   Okay.  So the fact that they may or may not have a

7  judgment against you at some point in the future is not going

8  to impact your ability to put up the money that's been put

9  up?

10     A.   Yes.

11     Q.   All right.  And then with regard to the amount of

12  the -- if you'll look at Exhibit 17.

13     A.   Yes.

14     Q.   We did a calculation, if you will, based on the

15  possible secured claim of United Central Bank at the

16  different interest rates, 5 and 5.25.  And those are the two

17  rates the plan calls for; is that correct?

18     A.   Yes.

19     Q.   Okay.  And then depending upon what the ultimate

20  amount of the UCB secured claim is, we projected what the

21  monthly payment would be.

22       Do you see that?

23     A.   Yes.

24     Q.   Okay.  And at the bottom using a value of

25  4,250,000, the 611 is the amount that's owed on the taxes; is

1   that correct?

2       A.   Yes.

3       Q.   Okay.  And then if you use a value of 4.7 million

4   and you take off the tax amount, that produces a net number

5   of, 4 million 88.

6        Do you see that?

7       A.   Yes.

8       Q.   Okay.  We actually -- for some projections we're

9   going to look at, we actually use the 4,250,000 less the tax

10  amount that resulted in 3,638,582; is that correct?

11      A.   Yes.

12      Q.   Okay.  And then your monthly payment is 18 7, under

13  5 percent, 19 2 under 5.25; do you see that?

14      A.   Yes.

15      Q.   Okay.  This is the same bank that your original

16  payment was $50,000 a month, correct?

17      A.   Yes.

18      Q.   Okay.  If we look at Exhibit 18.  Those are

19  projections that were procured based on some objections

20  raised by the Bank using your operating numbers and then also

21  projecting out your plan payments; is that correct?

22      A.   Yes.

23      Q.   All right.  And what we've projected, months June

24  and July, or the first two months of the plan, the hotel

25  would still be shut down; is that correct?

1      A.   Yes.

2      Q.   Because you'd be doing your repairs?

3      A.   Yes.

4      Q.   The plan payments, if the plan were confirmed

5  today, the plan payments would actually start in July, not in

6  June, and then July and August.  So you actually would have

7  two months -- you will always have two months of plan

8  payments that will have to be made without actually having

9  the hotel open; is that correct?

10     A.   Yes.

11     Q.   Okay.  So that's what we've shown here.  We've

12 shown total owner's contribution between the loans and the

13 amounts put up in trust $697,000 and then the actual -- what

14 we show are operating expenses the first couple of months

15 while you're actually doing the major repairs; is that right?

16     A.   Yes.

17     Q.   Okay.  And then we also show the plan payments at

18 the bottom.  And what I wanted to point out is that we

19 tracked the plan payment 18,757, which is the proposed plan

20 payment at 5 percent based on an estimate of the amount owed

21 to the Bank; is that correct?

22     A.   Yes.

23     Q.   Okay.  And we show that even after making all of

24 those payments, that there is still net income -- after we

25 pay all of the creditors, there's still net income to the

1  bottom line; is that right?

2      A.   Yes.

3      Q.   Now, Mr. Dhillon, obviously one of the concerns the

4  Bank keeps raising is the concern that what happens if

5  there's not enough money.  What if the 697,000 or the

6  whatever ends up not being enough to carry this particular

7  property.

8       Are you in a position to make up any additional

9  shortfalls?

10     A.   Yes, I am.

11     Q.   I mean, you're putting a lot of new money into this

12  hotel.  Obviously you're going to try to make sure that it

13  succeeds; is that correct?

14     A.   Yes.

15     Q.   All right.  And you made substantial financial

16  commitments.  I want to be clear that you've actually  put up

17  in trust $397,000; is that correct?

18     A.   Yes.

19     Q.   All right.  And Mr. Pate has testified under oath

20  that he is going to put up another 249,000, correct?

21     A.   Yes.

22     Q.   All right.  And if there were a shortfall in the

23  first couple of months of the plan payments, are you prepared

24  to dig in your pocket to make sure that those payments are

25  made?

1        A.    Yes, I am.

2        Q.    Now, the numbers don't reflect that you need to do

3   that.  But if you needed to do that, you will do that,

4   correct?

5        A.    Yes.  I will do it.

6        Q.    All right.  With regard to confirmation of your

7   plan.  Has the plan that you've proposed been proposed in

8   good faith?

9        A.    Yes, it is.

10        Q.    This hotel should have been opened over a year ago

11   and it hasn't been opened because you didn't have access to

12   funds; is that right?

13        A.    Yes.

14        Q.    So you've actually dug into your own pocket to come

15   up with the funds to try to make this plan work?

16        A.    Yes.

17        Q.    Okay.  You've proposed in your plan that the Bank

18   would retain the insurance monies that it's holding; is that

19   correct?

20        A.    Yes.

21        Q.    Okay.  And you're not asking for those to be given

22   back to use to fix up the hotel; is that correct?

23        A.    Yes, that's correct.

24        Q.    All right.  You got your disclosure statement

25   approved.  You attended the debtor interview.  You attended

1   the 341 Meeting.  You filed all of your monthly operating

2   reports.

3        Have you paid the U.S. Trustee their quarterly fees?

4        A.   Yes.  We've been making the (indecipherable word)

5   requirement.

6        Q.   So you're current on all of your administrative

7   requirements?

8        A.   Yes.

9        Q.   U.S. Trustee's Office has not filed any current

10  motion to dismiss or convert the case that's set to be heard

11  along with this particular matter; is that correct?

12       A.   Yes.

13       Q.   And have you disclosed the people that will

14  continue to operate the business after the bankruptcy?

15       A.   Yes.

16       Q.   Okay.  And your management company, along with

17  Mr. Pate, were to be the people primarily involved in this

18  property for the next several months; is that right?

19       A.   Yes.

20       Q.   And then who will continue to manage the property

21  after that?

22       A.   I will work with our GM.  And then we will check on

23  weekly basis and daily basis we'll be there.

24       Q.   All right.  One thing, also, I wanted to have you

25  take a look at.

1        We have proposed a management fee, if you look at

2   Exhibit 18, of $5,500 a month; is that correct?

3        A.    Yes.

4        Q.    And that would be a fee that would be paid to you

5   and your company; is that right?

6        A.    Yes.

7        Q.    For managing this property?

8        A.    Yes.

9        Q.    You agreed during the lunch break that you would

10  waive any management fee for the life of the plan, if those

11  funds were needed to cover operations; is that correct?

12       A.    Yes, I did.

13       Q.    Okay.  And that's an extra $5,500 a month that

14  would be left in the pot to make sure that the plan payments

15  can be made?

16       A.    Yes.

17       Q.    Okay.  Are there any other expense items, specific

18  expense items that you're willing to waive or give up on,

19  should need be, in order to make sure the plan can be funded?

20       A.    Everything looks in line.  And management fees will

21  be (indecipherable word), if it is needed.

22       Q.    Okay.  So if the plan payment were to go up higher

23  than the $18,000 a month, there would be a potential

24  management fee to cover that shortfall; is that correct?

25       A.    Yes.

1    Q.   Mr. Dhillon, you're giving this plan your best

2    effort; is that right?

3    A.   Yes.

4    Q.   And the creditors that have voted for your plan, we

5    have at least three impaired classes that voted to accept

6    your plan; is that correct?

7    A.   Yes.

8    Q.   Okay.   Those small secured creditor classes that

9    voted for your plan, those appear to be individuals that

10   loaned money to the debtor for specific items that were

11   purchased for the hotel; is that correct?

12   A.   Yes.

13   Q.   And they have UCC's on file for those?

14   A.   Yes, they do.

15   Q.   Okay.   And those were all entered into pre-petition

16   to assist the debtor; is that correct?

17   A.   Yes.

18   Q.   As I understand it, those are people who provided

19   either TV's, or what were the actual items that were

20   provided?

21   A.   TV's, microwaves, and a copier machine.

22   Q.   Okay.   And they have security interest in those

23   items?

24   A.   Yes.

25   Q.   Okay.   And with regard to the treatment of your

1  creditors, are you paying as much as you can to all of your

2  classes of creditors?

3      A.   Yes.

4      Q.   Okay.  In fact, the Bank's complained that they

5  don't think that your plan is feasible.  So obviously they

6  think that you're probably paying too much to your creditors.

7      Do you understand that?

8      A.   Yes.

9      Q.   All right.  Based on your testimony, Mr. Dhillon,

10 do you believe that your plan is feasible and not likely to

11 be followed by the need for any further reorganization?

12     A.   No.  It's feasible.

13     Q.   Okay.  If it wasn't feasible, would you be putting

14 almost $400,000 into this plan?

15     A.   Yes, you're right.  I would not be putting in if

16 it's not feasible.

17     Q.   Okay.  So if it wasn't feasible, you wouldn't be

18 putting all of that money in?

19     A.   Yes.

20     Q.   And it's your expectation that at the end of three

21 years that you'd be able to sell or refinance this property;

22 is that right?

23     A.   Yes.

24     Q.   Okay.  And pay off the Bank?

25     A.   Yes.

1       Q.   And have you had any luck negotiating with the Bank

2  since the bankruptcy case was filed?

3       A.   We tried on several occasion, but we have no luck

4  on that so far.

5       Q.   Do you know what's happening with the Bank right

6  now?  Are they undergoing some changes?

7            MR. ALLEN:  Your Honor, objection.  This has

8  nothing to do with the plan confirmation.

9            THE COURT:  Hold on.  I need you to speak into

10  the microphone.

11           MR. ALLEN:  Objection, Your Honor.  This has

12  nothing at all to do with the plan confirmation, what's going

13  on at the Bank.

14           MS. LINDAUER:  Your Honor, I'll ask another

15  question.

16           THE COURT:  All right.

17      Q.   Mr. Dhillon, does your plan propose to pay each and

18  every class of creditors a return under the plan, to the

19  extent they have allowed claims?

20      A.   Yes.

21      Q.   All right.  And just to be clear, based on your

22  projections, the largest creditors being paid are United

23  Central Bank and then the property tax, which is Property Tax

24  Lending; is that right?

25      A.   Yes, correct.

```
1       Q.   And the amount that we're paying Property Tax

2  Lending was increased based on UCB's objection, obviously,

3  and an agreement to pay them a higher rate of interest so

4  their payment is now around $11,000 a month; is that right?

5       A.   Yes.

6       Q.   All right.  And then the other creditors are

7  actually your small secured creditors, the unsecured

8  creditors, and then -- so it's basically taxes and the Bank

9  are the main creditors?

10      A.   Yes.

11      Q.   Okay.

12               MS. LINDAUER:  Your Honor, I'll pass the

13 witness.

14               THE COURT:  Cross?

15               MR. ALLEN:  Yes, Your Honor.  I'm sorry, I

16 didn't hear you.  Yes, we will cross.

17               THE COURT:  You may proceed.

18                    CROSS-EXAMINATION

19 BY MR. ALLEN:

20      Q.   Let me just start with some background.

21       You don't dispute right now that you owe UCB on this

22 property about 6,425,000, do you?

23      A.   The real loan was close to 6.5 million and was paid

24 down.  And almost in six months -- nine months no payment

25 have been made to the Bank.
```

1      Q.   Do you agree with me that you owe the Bank about

2   6,425,000?

3      A.   I would say.

4      Q.   Okay.  And would you agree with me that this

5   property failed to generate enough income to pay ad valorem

6   taxes during the year 2008?

7      A.   Yes.  Because payment was 50,000 and that's why

8   property tax was not paid.

9      Q.   Mr. Dhillon, I'm talking about your ad valorem

10  taxes on the property.

11       Will you agree with me here that while you had the

12  hotel open in 2008, it failed to generate enough income to

13  pay the ad valorem taxes for the year 2008?

14     A.   Yes.

15     Q.   Will you agree with me that it failed to generate

16  enough income to pay the ad valorem taxes for the year 2009?

17     A.   Yes.  Revenues went down and could not pay.

18     Q.   Would you agree with me that you failed to pay

19  the -- pardon me.  That the property failed to generate

20  enough income in the year 2010 to pay the ad valorem taxes?

21     A.   Yes.

22     Q.   And as a result of that, you borrowed money from

23  Property Tax Lending; is that correct?

24     A.   Yes.  And Bank was aware of that.

25     Q.   And you owe them approximately $500,000; is that

1   correct?

2       A.   Yes.

3       Q.   And will you agree with me that the 2011 ad valorem

4   taxes have not been paid?

5       A.   Yes.

6       Q.   And will you agree with me that you've made no

7   payments to -- pardon me.  Will you agree with me that you've

8   made no payments on the, or escrowed any money to pay the

9   2012 ad valorem taxes as of this time?

10      A.   Yeah.  I have deposited five months of taxes with

11  my attorney's trust account.

12      Q.   All right.  Now, the original plan that you filed

13  in this case indicated that the property from the minute you

14  turned the key when it was ready to be occupied would

15  generate income of -- room income of 150,000 a month; is that

16  correct?

17      A.   Yes.  Somewhere around that number.

18      Q.   And how you're saying since the renovation will be

19  going on for at least three months, you won't have any income

20  from the property; is that correct?

21      A.   Yes.  Since it's not opened, there won't be any

22  income.

23      Q.   Okay.  Would you agree with me that the hotel

24  won't be operational and ready to start business until

25  September of 2012?

 1      A.    Somewhere around August or September.

 2      Q.    Well, August or September.  Isn't it September the

 3  date when you expect that this property will be open for

 4  business?

 5      A.    Yes.

 6      Q.    Now, when it opens in September, the hotel will

 7  have been closed about 19 months; is that correct?

 8      A.    Yes.

 9      Q.    And you were asked about a judgment that UCB has.

10  That judge is, is it not, in the amount of $9,536,220; is

11  that correct?

12      A.    Yes.  And we have filed a motion.

13      Q.    What other judgments do you have against you?

14      A.    I don't think I have any other.

15      Q.    You have no other judgments against you by any

16  creditor; is that your testimony?

17      A.    Yes.

18      Q.    Have you remembered testifying in the motion to

19  lift stay that you had income of approximately $50,000

20  annually?

21      A.    No.  I remember the question was how much salary do

22  I get from the management company.

23      Q.    From the management company?

24      A.    That's what the question was and my answer,

25  $50,000.

NATIONAL COURT REPORTERS (214) 651-8393

 1     Q.    From all of your management companies?

 2     A.    There's only one management company.

 3     Q.    Okay.  Is that the management company for this

 4  hotel?

 5     A.    Yes.  It will be managing this hotel, as well.

 6     Q.    Okay.  Well, is there one management company that

 7  manages a number of hotels?

 8     A.    Yes.

 9     Q.    And the combined income that you get from managing

10  all of those hotels is $50,000 annually; is that correct?

11     A.    That's not true.

12     Q.    What is it?

13     A.    It is percentage base.  Sometimes it is 4 percent,

14  5 percent of the revenue for each property.  So it varies

15  every month.

16     Q.    Okay.  Now, as I understand your plan, your plan

17  calls for you making a balloon payment to United Central Bank

18  at the end of three years; is that correct?

19     A.    Yes.

20     Q.    And I've done the calculations and I'm subject to

21  being wrong, but that balloon payment will be somewhere in

22  the neighborhood of around $3,248,000.

23      Are you aware of that?

24     A.    Yes.

25     Q.    And are you testifying to the Court that that's not

1   a problem?  You can pay that?

2        A.   Yes.

3        Q.   Okay.  Now, let me ask you, on your plan, which I

4   think is Exhibit 18 in your book.

5        A.   Yes.

6        Q.   Now, that's the new plan as of today.  There was a

7   previous plan, correct?

8                  THE COURT:  Exhibit 18?

9                  MR. ALLEN:  Exhibit 18, Your Honor.

10                 THE COURT:  Those are projections.

11                 MR. ALLEN:  Those are projections, that's

12  right, Your Honor.

13                 THE COURT:  Okay.  It's not in the plan.

14                 MR. ALLEN:  Excuse me.  That was my

15  terminology, my error.

16       Q.   Exhibit 18.  You're predicting that you will

17  generate from the first month that this property is opened

18  for business 150,000 in income, in rental income; is that

19  correct?

20       A.   Yes.

21       Q.   Has your business, while you operated that hotel,

22  during any time in 2008, 2009, or 2010 ever averaged $150,000

23  a month in room rentals?

24       A.   It was close to 1.8, 1.9 million revenue.  So it

25  did average, yes.

1      Q.    Okay.

2             MR. ALLEN:  Judge, may I approach and give you

3   a copy of a document?  It has an exhibit stamp on it.

4             THE COURT:  You may.

5             MR. ALLEN:  May I give the witness a copy,

6   also?

7             THE COURT:  You may.

8      Q.    Tell me -- let's start with this.

9        In order to generate room rental, what's involved?

10     A.    People stay in the hotel and they check out.

11  That's the income you collect and that's your room rental.

12     Q.    Okay.  Two things actually go in to generating room

13  revenue; do they not?

14     A.    Main thing is your night stay, somebody staying at

15  the hotel, how much you charge them.  That's the main reason,

16  how much it is.

17     Q.    That's called revenue per available room, isn't it,

18  rev par?

19     A.    No, sir.  We call ADR, how much ADR you can get per

20  customer and occupancy.

21     Q.    Okay.  So that's how much somebody pays on average

22  for a room at Holiday Inn Express, correct?

23     A.    Yes.

24     Q.    Some are $80 rooms and some rooms are $50 rooms,

25  correct?

1      A.    We don't sell $50.  Our asking rate is 119 and then

2   negotiate with the groups for 99.  So 95 is our lower bench.

3   We don't go below that.

4      Q.    Okay.  Have you ever turned in any statements or

5   reports to the State of Texas that reflected average room

6   rates for your Holiday Inn Express?

7      A.    No.  Only statement we turn is the room revenue,

8   how much we do every month.  We just give them lump sum

9   number.  That's about it.

10     Q.    Okay.  Have you ever turned in any documents to the

11  State of Texas that reflects the amount of -- or percentage

12  of rooms in your hotel that are leased on any given month or

13  quarter?

14     A.    Only thing we submit how much monthly revenue we

15  did for last month.  We submit that revenue.  And then we pay

16  tax on that, whatever the calculation comes out to be.

17     Q.    Now, let me -- let me ask you, in 2008 do you know

18  what your average monthly income was?

19     A.    Yeah.  I'm looking at exhibit you handed out.   It

20  shows 1.730 and then average is 144.

21     Q.    Do you disagree with that number?

22     A.    I do.

23     Q.    And why?

24     A.    There's some other revenues that we have in the

25  room revenue in that hotel that is not reported in State of

 1    Texas.  The only actual room revenue, we have some food

 2    membership in 2008, '09.  We had a sweet shop that was there

 3    with a lot of candy to the customers, I mean, waters.  The

 4    sweet shop sells a lot of stuff.  And long distance charges

 5    we do that people come to use our hotel for and from the

 6    rooms, we charge them.  And then we had a movie income, sort

 7    of lot a (indecipherable word).  You rent a movie, you pay 9,

 8    $10.  That's additional income to room revenue that will not

 9    consider in this.  That's all -- and then we have a meeting

10    room.  It can be from 3,000 to 4,000 every month, depending

11    on how many groups we have in-house.  That's additional to

12    that.

13         Q.    Your plan, and I'm looking at Exhibit 18, again,

14    reflects that all of those things that you've talked about as

15    other income amounts to $2,000 a month; is that correct?

16         A.    Yes.  Yeah.  That's projections we have.

17         Q.    So if I add the $2,000 a month to the $144,216 a

18    month average that your hotel ran in 2008, that doesn't get

19    me to 150,000, does it?

20         A.    No, sir.  This is future.  And that 2008 we had

21    more because we had different meeting rooms.  Groups always

22    changes.  You cannot compare 2008 number with 2012.

23         Q.    Okay.

24         A.    You cannot mismatch them.

25         Q.    Okay.  Let's compare 2009.

1      Am I correct that your average monthly income in 2009

2   was a little over 142,000 a month?

3      A.   That was just room revenue.  Not additional income.

4      Q.   We add the 2,000 on top of that and we're at

5   144,000, correct?

6      A.   Sir, on Exhibit 18, that's our projection, 2,000 a

7   month.  But we were getting more because we had a lot of

8   growth.  There was a sweet shop in there.  And then as I

9   said, depending on how much groups we get and how much room

10   rental, how much meeting room rental we charge -- and

11   actually it was more in 2008 and '09 and '10.

12      Q.   Okay.  And in 2010 your average monthly income had

13   dropped; had it not?

14      A.   Yeah.  The whole nation was suffering from the

15   economy and we did lose a lot of revenue, that's true.

16      Q.   To about 140,000?

17      A.   Yes.  It went down.

18      Q.   All right.  And, again, I'm trying to get this

19   number.  What was the occupancy rate, percentage of occupancy

20   at your hotel in, say, the year 2010 for the whole year?

21      A.   Sir, I don't recall.  I don't have the report in

22   front of me.  But I can get it to you.

23      Q.   Well, does the number 63.3 percent sound right?

24      A.   Actually, there's no ADR.  You don't -- this report

25   don't have ADR.

1    Q.    Sir, does 63.3 percent sound about right for your

2    room occupancy percentage during the year 2010?

3    A.    After looking at my reports, I don't know if this

4    is right or wrong.  This is not prepared by me, so I cannot

5    (indecipherable word) to this report.  I think you need ADR.

6    You're missing one part here.  That's ADR, average daily

7    rental.  You don't -- you have not calculated that.  Let's

8    say if I'm charging $110 for room and you have 50 percent

9    occupancy, you'll get same room occupancy.  You'll get same

10   room revenue.  If I'm charging -- as you say, if I charge

11   $50, I have to have 90 percent to get that time of revenue.

12   So this is -- some projections are missing.  Something is

13   wrong in there.

14   Q.    Okay.  So you're saying this AD -- what was the

15   terminology you used?

16   A.    Average daily rate.

17   Q.    Okay.  And that would be, again, averaging the $100

18   room and the $50 room, for my example, to come out with an

19   average rate of $75 per room, correct?

20   A.    No, sir.  Like you mentioned to do 140 revenue a

21   month, let's say if I sell that room for $50.  I have to be

22   90 percent full to get the 140.  And if I -- if my average

23   daily rate is $100, I will be only doing 50 percent occupancy

24   because I'm collecting more per room.

25              MR. ALLEN:  Could I have just a moment, Your

1  Honor?

2              THE COURT:  You may.

3      Q.   Look at Exhibit R, please, sir.  And that will be

4  in UCB's book.  You should have a copy of it up there.

5              MR. ALLEN:  Your Honor, for older eyes, I've

6  just blown up that.  Can I give that --

7              THE COURT:  You may.

8      Q.   Do you have Exhibit R in front of you, sir?

9      A.   Yes, I do.

10     Q.   If you look, that's titled, Texas Hotel Performance

11 Fact Book.  And it's been admitted as -- in evidence here.

12      If you would, look on the first page of that exhibit,

13 that is R0386 and it lists various hotels by town.  Come down

14 to Sherman, if you would.  And the page that I mentioned is

15 for the period of time September 30th, 2010 to September the

16 30th, 2011.  And I recognize when the damage took place to

17 your hotel.  But I'm simply going to ask you, according to

18 these records -- let me back up.

19      As I understand, the two hotels closest to you are

20 Hampton Inn and the La Quinta; is that correct?

21     A.   Yes.

22     Q.   Okay.  If I again look at this exhibit, the first

23 page 0386, and find a La Quinta and go over to the year 2010

24 where they have an estimated percentage of occupancy for the

25 La Quinta, does it say 57.6 percent?

1       A.   Yes.  For 2010, yes.

2       Q.   For 2010.  And continuing on that same line, if you

3   go to the right.  For 2010 it shows a rev par, which is

4   revenue per average room for a La Quinta, your neighbor, of

5   $41.54; is that correct?

6       A.   Yes.  That's what it says here.

7       Q.   And let's come down to the Hampton Inn.  And for

8   2010 am I correct that the Hampton Inn reflects a percentage

9   of occupancy for their hotel of 61.8 percent?

10      A.   Yes.

11      Q.   And continuing to the right some more.  Under

12  revenue per available room it appears that La Quinta was

13  getting $62.17 as an average rate; is that correct?

14      A.   No, sir.  See the rev par is not an EDR.  You're

15  confusing rev par and EDR.  It's two different things.

16      Q.   Okay.  Just answer that question, if you will.

17  Does the rev par show on here that Hampton Inn is making

18  $62.17 per room?

19      A.   That's what it says here.

20      Q.   Okay.  Now, let's go over to the second page of

21  Exhibit R.  And under Sherman, if you will come down about

22  six or seven hotels to Holiday Express.

23       Do you see that?

24      A.   Under Sherman, yes.

25      Q.   Okay.  And the second page deals with the period of

1   time for the year 2009; does it not?  If you'll look at the

2   top of the page it shows what period is covered by the second

3   page of Exhibit R.

4        A.   Fourth quarter of 2009.

5        Q.   Well, it says for the 12 months ending December 31,

6   2008 compared to the 12 months ending December 31, 2009.

7        A.   Yes.

8        Q.   All right.  Now, for the Holiday Inn for, 200,

9   let's go 8, this reflects that your percentage of occupancy

10  was 63.7 percent; is that correct?

11       A.   Yes.

12       Q.   And in 2009, 2009 your percentage of occupancy was

13  67.9 percent, correct?

14       A.   Yes.

15       Q.   Your revenue per room for 2009 was $56.44, correct?

16       A.   I don't know what are you asking, revenue per room?

17  It cannot be that much.  It's wrong.  This is not ADR.

18       Q.   According to this exhibit, sir, which has been

19  admitted, it shows your revenue per room of $56.44; is that

20  correct?

21       A.   No.  My revenue was not -- my ADR was not $56.

22       Q.   I don't want to be argumentative.  Is that what the

23  exhibit reflects?

24       A.    That's what it shows, yes.

25       Q.   For your hotel for the year 2008.

1        For 2009, am I correct that your revenue per room was

2    $55.71?

3        A.    Yes.  Rev par was 57.  That's what it says here.

4        Q.    Go back up to your competitors on the same page.

5        Hampton Inn, was Hampton Inn's occupancy in 2009 69.5

6    percent of available rooms?

7        A.    Yes.

8        Q.    Was Hampton Inn's revenue per room in 2009 $69.06

9    per room?

10       A.    Yes.

11       Q.    And in 2008 was Hampton Inn's revenue per room

12   $69.29?

13       A.    Yes.

14       Q.    And so we'll have their occupancy rate, Hampton

15   Inn's occupancy rate for 2008 was also $69.02; is that

16   correct?

17       A.    To rev par, not ADR.

18       Q.    69.2 percent, I apologize.

19       Let's go up to La Quinta, same page, same year.  In

20   2008 was La Quinta's percentage of occupancy 62.1 percent?

21       A.    Yes.

22       Q.    Was La Quinta's percentage of occupancy in 2009

23   53.9 percent?

24       A.    No.  You're readying for a Comfort Suites.  La

25   Quinta is above one, 53. --

1        Q.    I apologize.   You're absolutely correct.

2         For La Quinta for the year 2008 it was 66.7 percent,

3    correct?

4        A.    Yes.

5        Q.    And for 2009, 63.6 percent?

6        A.    Yes.

7        Q.    And their revenue for 2008 per room was $53.89?

8        A.    That's the rev par.

9        Q.    And the revenue per room in 2009 was 48.66?

10       A.    Yes.

11       Q.    Now, let's go to really the last year of your

12   operation, the third page of Exhibit R, which is the period

13   of time --

14            THE COURT:   Let me ask you a question.

15        Was Exhibit R admitted?

16            MR. ALLEN:   Exhibit R has been admitted, I

17   thought.

18            THE COURT:   Right.   Okay.   I don't need this

19   witness to tell me what Exhibit R says, if it's been

20   admitted.   You can argue from it, but we don't need to spend

21   a lot of time asking him if that's what it says and he

22   agrees.   It is what it is.   It's admitted.   I look at it in

23   your closing.   Okay?

24            MR. ALLEN:   That's fine.

25            THE COURT:   Do you have any other questions

NATIONAL COURT REPORTERS (214) 651-8393

1    for this witness?

2            MR. ALLEN:  I do.  I do.

3            THE COURT:  You may proceed.

4    Q.    Now tell me, in 2010 am I correct that your

5    percentage of occupancy was it reflected in this Exhibit R?

6    A.    Sir, I don't know where you got this report from.

7    But if that's what this report says, yes, you can assume

8    that.

9    Q.    Okay.  For purposes of this $150,000, again, I

10   hadn't heard the answer.  What is -- are you projecting your

11   percentage of occupancy for the first month of this -- of

12   this hotel being opened?

13   A.    It will be close to 55 to 60 percent and 99 or $100

14   ADR.  We have already start promoting with our director of

15   sales we're going to hire in a few weeks.  And then we'll be

16   selling order for September through November.  So we're

17   pre-selling the hotel.  That will help us to achieve that

18   number.

19   Q.    Okay.  So 55 percent 60 percent occupancy.  And

20   what would be your average room rate?

21   A.    Our ADR, average daily rate, we will be starting

22   off from 119, but I know it will come around, it will come

23   around to $99, $98, somewhere around that number.

24   Q.    Now, let me ask you a few other questions.

25         On -- have you managed other hotels?

1      A.   Yes, I do.

2      Q.   Isn't it true that some of these lenders on other

3   hotels have required you to turn over the management of

4   hotels to other third-party managers?

5      A.   Only --

6      Q.   Yes or no.

7      A.   -- only one property.  And I was not manning it.

8   It was more than two years I didn't manage the hotel.

9      Q.   Was it the Meacham Hotel?

10     A.   Yes.

11     Q.   And wasn't it true that the lender on the Meacham

12  Hotel told you they had a concern with your accounting for

13  the money that you were taking in on the Meacham Hotel, so

14  they replaced you as the management?

15     A.   That's not true.  They never asked me to do

16  anything like that.

17     Q.   Now, you mentioned these two other small creditors

18  that you had that -- I can't remember, Mr. Gyra and another

19  gentleman.

20       Did you -- are they secured creditors?

21     A.   Yes.  They have UCC filings on the property.

22     Q.   Okay.  And tell me what -- let's start with

23  Mr. Gyra.  What is his UCC filing pertaining to?

24     A.   Property needed, a lot of customers were requested

25  faxes, copies, so we had to have a copy machine.  So we

1   bought a copy machine.  And then there were some TV's and

2   microwaves for the rooms.

3        Q.   Okay.  What property was all of that from?

4        A.   All for Sherman Holiday Inn Express, Dhillon Group.

5        Q.   Okay.  And did you approach UCB and ask them if you

6   could give a lien to another creditor on property that they

7   had the security interest in?

8        A.   I went many times.  I called many times.  I emailed

9   many times requesting a line of credit or just, you know,

10  some kind of help with the reduction of the payment.  Every

11  time I went or asked or emailed, it was denied.

12       Q.   Okay.  How about the other gentleman, Mr. Dhami?

13       A.   It is for same hotel.  It's for the Holiday Inn

14  Express in Sherman, Dhillon Group.

15       Q.   Okay.  Well, where are these TV's and microwaves

16  and all of that?  Are they still at the hotel?

17       A.   Yes, sir.  They're all secured at the property as

18  we speak.

19       Q.   Let me make sure I understand what your plan is.

20  And just tell me if this is right or wrong.

21            THE COURT:  I need you to speak into the

22  microphone.

23            MR. ALLEN:  I'm sorry, Judge.  I apologize.

24       Q.   Just make sure that I'm right on what you've said

25  to the Court.  What you've said to the Court is these numbers

1   don't mean a whole bunch on these projections.  I'm sorry I

2   said plan, but projections.  These numbers don't mean a whole

3   bunch because you are going to make up any shortfall that

4   happens in the operation of that hotel.

5        Is that what you've basically said?

6        A.   No, sir.  This number means whole lot.  I've been

7   doing this for last 10, 15 years.  I have done it on

8   personally more daily.  And this is what I do for a living.

9   These are very close numbers.  But these are all, as you

10  know, projections.  We've been giving very close numbers.  It

11  can be 5 percent or 3 percent change.  But if the change

12  happens, I'm willing to put more money from my pocket until

13  we don't open.

14       Q.   Let me -- how about Dr. Sony.  Is he a third owner,

15  interest owner in this property?

16       A.   Yes, he is.

17       Q.   Okay.  And what -- what kind of deal do you have

18  with him?  Is he supposed to get something out of this hotel,

19  other than being an equity interest owner?

20       A.   No, sir.  In the plan it says nothing for Dr. Sony

21  here.

22            MR. ALLEN:  Give me just a moment, Your Honor.

23       Q.   Now, Dr. Sony filed a lawsuit against you; did he

24  not?

25       A.   We settled almost a year and a half ago.

 1      Q.    Okay.  What did you settle for?

 2      A.    There was some dispute between us and we came to a

 3  resolution and it has been settled as of March.

 4      Q.    And did he accuse you of fraud?

 5      A.    Sir, he accused me for everything.  But I have

 6  provided everything he wanted.

 7      Q.    Just, if you will, just answer my question.  Did he

 8  accuse you  fraud?

 9      A.    Fraud for what, sir?

10      Q.    Fraud in the lawsuit and the investment that you

11  got him into.

12      A.    He was my partner.  And then there was a loss of

13  pride and we have settled.  We have reached an agreement as

14  of March of 2011.

15      Q.    It's Exhibit L.  Let's look at it.

16       Got it?

17      A.    Yes.

18      Q.    Okay.  That's the lawsuit Dr. Sony filed against

19  you that you say you've resolved?

20      A.    Yes.

21      Q.    And just briefly, in the lawsuit he accuses you of

22  fraud and breach of fiduciary duty, doesn't he?

23      A.    Sir, anybody -- he can accuse me for anything.  But

24  we reached an agreement.  We settled this case almost a year

25  and a half ago.

1    Q.   And, again, what did you agree to pay Mr. Sony, or

2   Dr. Sony?

3    A.   When we bought the hotel in 2007 together, and we

4   thought it was a profitable thing.  But downturn in the

5   economy, nobody made money on this hotel and he was upset

6   about it.

7    Q.   Tell me again, what did you agree to settle for and

8   how are you supposed to pay it?

9    A.   Oh.  On that one, I don't have the documents.  But

10   it's -- in the plan Dr. Sony gets nothing from this plan.

11   That's what I proposed to this Court.

12    Q.   Where did you get the $345,000 that you're going

13   to use to make repairs?

14    A.   I borrowed some, the money, as I testified last

15   time.

16    Q.   Who did you borrow it from?

17    A.   From (indecipherable name).

18    Q.   Is that somebody here in Dallas?

19    A.   No, sir.  He's in New York.

20    Q.   Did you borrow the whole thing from him?

21    A.   Partial of it.  Most of it.

22    Q.   And how are you -- how are you to repay him?

23    A.   Personally.

24    Q.   Personally, but how?

25    A.   I mean, I'm going to pay him over seven to ten

1   years and he's okay, he's all right with it.

2       Q.   Did you personally promise Dr. Sony any part of the

3   property, or any more interest in the property if this plan

4   is confirmed?

5       A.   No.  100 percent plan goes under my name.  There's

6   nothing goes to Dr. Sony.

7                MR. ALLEN:  Pass the witness.

8                THE COURT:  Redirect?

9                MS. LINDAUER:  Very briefly, Your Honor.

10               REDIRECT EXAMINATION

11   BY MS. LINDAUER:

12      Q.   Mr. Dhillon, just to be clear, Exhibit 10 is a copy

13   of the monies that you've already put up in trust for

14   confirmation of this plan; is that correct?

15      A.   Yes.

16      Q.   And that's for 350,000.  You also put up another

17   47,000 last Friday; is that correct?

18      A.   Yes.

19      Q.   397,000?

20      A.   Yes.

21      Q.   Okay.  And counsel was asking you questions about

22   the average occupancy, the average income for this property

23   and things.  And the average seems to run somewhere between

24   140 and 143, 144,000; is that correct?  But those are the

25   room revenues?

 1       A.    Yes.  That's the room revenue for the past years.

 2       Q.    Okay.  And that's -- I don't think it included,

 3  well it included a little bit of 2011, like one month; is

 4  that --

 5       A.    Yes.  Because we were shut down February 4th.

 6       Q.    The hotel business today, is it better than it was

 7  in 2009 and 2010?

 8       A.    Yes, it is.

 9       Q.    It's improved?

10       A.    It's improved.

11       Q.    Okay.  And it continues to improve; is that

12  correct?

13       A.    Yes.

14       Q.    Okay.  It appears your hotel is comparable with the

15  best hotels in the Sherman, La Quinta and Hampton; is that

16  right?

17       A.    Yes.

18       Q.    And based on the numbers that counsel passed up,

19  those hotels have experienced room revenues, total room

20  revenues in the neighborhood of 150, 160,000 a month; is that

21  right?

22       A.    Yes.

23       Q.    If we average out their numbers.

24       A.    Yes, correct.

25       Q.    How many rooms does La Quinta have?

1      A.   110 rooms, 115 rooms.

2      Q.   Okay.  And you have how many?

3      A.   84 rooms.

4      Q.   Okay.  And how about the Hampton?

5      A.   69 rooms.

6      Q.   So it's actually smaller than your's?

7      A.   Smaller than it, yes.

8      Q.   All right.  And do you believe that the $150,000 is

9  something that you can achieve within a reasonable period of

10  time?

11     A.   Yes.

12     Q.   Okay.  Obviously as a prudent property owner there

13  are things you can do on the expense side, obviously, to

14  reduce the expenses to make sure you have the income; is that

15  right?

16     A.   Yes.

17     Q.   One thing you said, you would be willing to give up

18  your management fees?

19     A.   Yes.

20     Q.   Okay.  And obviously there are other things that

21  you can do to remove additional expenses, if that's possible,

22  to make sure that you can make the payments called for?

23     A.   Yes.

24     Q.   Okay.  One thing you kept telling counsel was that

25  your payment to UCB was $50,000 during this period of time?

1       A.   Yes, that's correct.

2       Q.   The payment under the plan is somewhere between 18

3   and 19,000, significantly less?

4       A.   Yes.

5       Q.   Okay.  And counsel also asked you about being able

6   to pay off this loan at the end of the plan.

7        Is there any reason you shouldn't be able to pay this

8   off?

9       A.   No.  There should not be any reason.

10      Q.   Okay.  And even looking at all of the numbers that

11  have been provided by UCB, do you still believe you would be

12  able to pay it off?

13      A.   Yes.

14      Q.   All right.  And, Mr. Dhillon, you're asking the

15  Court to, with all of the money that's being put up here, to

16  approve your plan; is that correct?

17      A.   Yes.

18      Q.   As being in the best interest of all of the

19  creditors?

20      A.   Yes.

21              MS. LINDAUER:  No further questions of this

22  witness, Your Honor.

23              THE COURT:  Thank you.  The witness may step

24  down.

25              MS. LINDAUER:  Laura, do we have an agreement?

1                MS. WORSHAM:  Your Honor, I believe we have a

2    stipulation as to the value of the real property and personal

3    property as it sits now.  If I may proceed, the parties are

4    prepared to stipulate that the value of the property, real

5    and personalty, as is, not repaired is 3.9 million.  That's

6    exclusive of the insurance proceeds.  And as part of this,

7    the insurance proceeds the debtors agree  to assign to United

8    Central Bank in their entirety, subject to the pending claims

9    of Belfor and Adjustors International against a portion of

10   those insurance proceeds.  But for valuation purposes, we're

11   prepared to do 3.9 million, which under 5 percent under

12   debtor's plan would result in a monthly payment to UCB of

13   $22,799.

14               MS. LINDAUER:  Well, that's not taking out the

15   taxes.

16               MS. WORSHAM:  Well, 3.9 million.  I think

17   she's going to argue taxes.  But that particular number on

18   the valuation.

19               THE COURT:  Okay.  The agreement -- the

20   stipulation is 3.9 million including the insurance proceeds?

21               MS. LINDAUER:  Correct.

22               MS. WORSHAM:  No.  Exclusive.

23               MS. LINDAUER:  Exclusive of the insurance

24   proceeds.

25               THE COURT:  Okay.  And how much is the

1  insurance proceeds?

2            MS. LINDAUER:  They're around 880,000, Your

3  Honor.  And those would -- this resolves counsel on the

4  telephone's objection also, Your Honor, is that the debtor is

5  agreeing that UCB, Belfor, and Insurance Adjustors have

6  asserted claims against the insurance proceeds.  The debtor

7  will step out of that fight and allow those three parties to

8  resolve their disputes with regard to the insurance proceeds.

9  And however they are paid, ultimately, whether to UCB,

10  Belfor, or whomever, that our plan will not impinge or impede

11  them from resolving their claims against the insurance

12  proceeds.

13       To the extent that someone remains unsatisfied such,

14  for example, if Belfor remains unsatisfied, then they would

15  have an unsecured claim.  So their only claim, secured claim,

16  if you will, or assignment is against those proceeds.

17       There was some confusion, and I think Mr. Meyers can

18  weigh in on this.  But there was some confusion that if the

19  plan were approved, it might impede their ability to collect

20  against the insurance proceeds.  And we're carving those out

21  and saying, The debtor is going to allow those creditors to

22  decide how those get resolved among themselves.  But for our

23  purposes, plan confirmation, UCB will retain all of the

24  insurance proceeds, subject to the claims of the other

25  parties.  They can duke that out.  And then the remaining

1  real and personal property at the hotel we're stipulating is

2  valued at 3.9 million.  And then whatever affect that has on,

3  for example, tax creditor claims and things.  But for our

4  purposes, 3.9.  That avoids having to put on a lot of

5  appraisal testimony, Your Honor, given the shortness of time.

6              THE COURT:  All right.

7              MS. LINDAUER:  Correct?

8              MS. WORSHAM:  Yes, Your Honor.

9              THE COURT:  All right.  Any other evidence you

10 are going to present, or are you resting?

11             MS. LINDAUER:  Your Honor, I believe that

12 subject to any rebuttal we would have to put on very briefly.

13 But, Your Honor, with that, the debtor would rest.

14             THE COURT:  Okay.  Any evidence the lender

15 wishes to put on?

16             MR. ALLEN:  (Inaudible response.)

17             THE COURT:  I need you to speak into the

18 microphone, sir.

19             MR. ALLEN:  We have a witness on room rates,

20 feasibility, those types of things.

21             THE COURT:  Okay.

22             MR. ALLEN:  May I call the witness?

23             THE COURT:  Well, yeah.  How long is this

24 going to take?

25             MR. ALLEN:  I will go as fast as I possible

NATIONAL COURT REPORTERS (214) 651-8393

1    can.

2                THE COURT:  Well, no.  I asked you a question.

3    How -- I think everybody understood when we scheduled this

4    that we scheduled this on top of another matter, a trial and

5    other scheduling conflicts that the Court has.

6                MR. ALLEN:  I will blast --

7                THE COURT:  I'm just telling you, when it's 5

8    minutes until 3, we're leaving the bench.

9                MR. ALLEN:  I will try and blast through in 10

10   minutes.

11               THE COURT:  You may proceed.

12               (The witness was sworn by the courtroom deputy.)

13               MR. ALLEN:  May I proceed, Your Honor?

14               THE COURT:  You may.

15                    RUSSELL RIVARD

16    The witness, having been duly sworn to tell the truth,

17   testified on his oath as follows:

18                    DIRECT EXAMINATION

19   BY MR. ALLEN:

20       Q.   Would you state your name, please.

21       A.   Russell Scott Rivard.

22       Q.   Mr. Rivard, are you with an appraisal company that

23   does appraisals of hotels?

24       A.   Yes, sir.  U.S. Hotel Appraisals.

25       Q.   Okay.  And what position do you have with that

1  company?

2        A.    I'm a managing partner there.

3        Q.    And can you very briefly give the Court a history

4  of your background in the appraisal business?

5        A.    Absolutely.  2003 I was hired by Robin Cluff,

6  another partner.  And we have -- since then we are based in

7  Flower Mound and we have appraised approximately 3,000 hotels

8  nationwide.

9        Q.    And can you just briefly give the Court an idea of

10  some of the hotels, chains, or whatever they might be that

11  you've done appraisal work for?

12       A.    Absolutely.  Holiday Inn Express, Hampton Inn,

13  Comfort Inn Suites, full service Holiday Inn, Marriott's,

14  independents, all types of hotels.  That's all we do is

15  hotels.

16       Q.    All right.  Now, can you briefly give the Court a

17  little of your background as far as courses that you've

18  taken, seminars that you've attended, studies that you've

19  reviewed to -- in order to be cognizant of values in the

20  hotel industry?

21       A.    Sure.  Absolutely.  I'm a State Certified General

22  Appraiser.  To do that you need approximately 300 hours of

23  appraisal institute classes, courseware, and over two years

24  of experience before you can get certified.  And I've been

25  certified approximately five years now.

```
 1      Q.   Okay.  And do you have to -- as a certified

 2  appraiser, do you have to keep current and attend other

 3  annual seminars or events?

 4      A.   Yes, sir.  Continuing ed, it's called.  And we do.

 5      Q.   All right.  And you're current in all of your

 6  continuing education at this time?

 7      A.   Yes, sir.

 8      Q.   Okay.  Now, you were asked to take a look at this

 9  Holiday Inn Express in Sherman, Texas by United Central Bank;

10  is that correct?

11      A.   Yes.

12      Q.   All right.  And you've been in the courtroom when

13  some questions were being asked of Mr. Dhillon regarding

14  occupancy rates and percentages --

15      A.   Yes, sir.

16      Q.   -- pardon me, and income per room.

17       Can you tell me what you have done in order to try to

18  ascertain what a room rate should be for this Holiday Inn in

19  Sherman, Texas?

20      A.   We -- we typically look at, and in this case get

21  the historical operating statement, also occupancy rate

22  information.  Because it was closed at the time, we were able

23  to get 2010 numbers.  We confirm occupancy and rate with IHG,

24  the franchiser for Holiday Inn Express, so those numbers are

25  accurate in our report.  And then also we look in the market.
```

NATIONAL COURT REPORTERS (214) 651-8393

1  And we also order Smith Travel Report, which is a national

2  hotel database company that Holiday Inn Express and other

3  hotels report to and give their numbers.

4      Q.   Well, from these sources, are you able to ascertain

5  what the occupancy rate percentage is for the Holiday Inn in

6  Sherman, Texas?

7      A.   Yes, sir.  Well, in 2010, I think it was mentioned

8  earlier and it was confirmed with those numbers that -- I'm

9  going to it here.  The rate was -- excuse me.  Occupancy,

10  63.6 and rate at $86.03.

11      Q.   Okay.  Now, this hotel has been shut down, or would

12  have been shut down 19 months when it reopens.  Does that

13  come into play in your calculations of what type of room

14  revenue this hotel will generate from the beginning?

15      A.   Absolutely.  Some of the things that weren't

16  mentioned today is that the other hotels within the market

17  have benefited from the loss of 84 rooms in the last year or

18  so.  So, therefore, rate has gone up a little bit, 3 or 4

19  percent, I believe.  I'd have to look.  But they have

20  benefited from that.

21      Once the hotel opens, that influx of rooms is going to

22  affect every hotel, Hampton, Comfort Inn, La Quinta Inn.  And

23  so given the rate they've been achieving before with those

24  rooms added, it's going to be a little difficult, including

25  the subject property which obviously have a goal to make a

 1   certain revenue.

 2       Q.   Well, have you been able to establish what the --

 3   and let me back up.

 4       Can you tell the Court what rev par means in the

 5   appraisal, or in the hotel business?

 6       A.   Sure.  Quite simply it's occupancy times your

 7   average rate.  And so it's revenue per available room.

 8       Q.   Okay.  And was I incorrect when I said if you had

 9   $100 room and a $50 room, then your rev par for available

10   room would be $75?

11       A.   Well, it depends on the room availability.  But the

12   average rate would be combined to 75, average rate, yes.

13       Q.   Were you able to establish the average rate of the

14   competition to this hotel presently?

15       A.   This hotel, well, it's done on projections, because

16   it's closed.  But for the subject property, we call it, we

17   would -- we would compare it against its market.  We talked

18   about its market, the Hampton Inn, the Comfort Inn, the La

19   Quinta Inn.  It does a certain average rate and occupancy.

20   And that is reported by Smith Travel.  So we have compared

21   opening the subject property right at market, just 1 percent

22   below market.

23       Q.   And what would that be?

24       A.   Just a second.  Too many pages here.

25       The -- 99 percent, and it's called penetration.  But 1

1    percent below the market.  It will be 55 percent occupancy.

2    And the rate will be $73.  I know 99 was mentioned, but 73 is

3    the market right now.  And that's going to be tough to get

4    with new rooms coming in.

5        Q.   Okay.  So the market now in the Sherman area is 55

6    percent occupancy with a 73 percent room rate; is that

7    correct?

8        A.   That's correct.  That's what we're projecting off

9    known numbers, yes.

10       Q.   Okay.  Now, you mentioned the word "penetration".

11   What does that mean in terms of a new hotel opening?

12       A.   It's -- there are capture -- quite simply capture i

13   in the market.  If you substitute capture for penetration, it

14   would be easier.  We open the subject property right at

15   capture of what the market is doing.  And then we have it

16   increasing just slightly.

17       Q.   Okay.  And how do you capture market?

18       A.   You open.  You're aggressive in your sales and

19   marketing efforts and working off your franchise reservation

20   system.

21       Q.   And does that also mean reducing room rates?

22       A.   Well, it could.  Because in order to capture those

23   patrons that are there, the business people, that now the

24   subject property has lost to a renovated Hampton and a

25   renovated La Quinta, he's going to have to lower rates, most

1   likely, and bring the whole market a little down in order to

2   capture those people back.  There's only so much demand.

3        Q.   Do you have an opinion as to what length of time it

4   will take for this Holiday Inn Express to recapture its

5   percentage of the market?

6        A.   We have it stabilizing in year four.  It's going to

7   take three years of ramp up, they call it.  And in its fourth

8   year it will stabilize.  It is a good flag, sir.  And it is a

9   good location.  We have it out penetrating the market a

10  little bit once it's stabilized.  It will do that, but it's

11  going to take some time.

12       Q.   What is your opinion of what the room rate --

13  pardon me, room income will be for this hotel when it opens?

14       A.   Room rate, minus what Mr. Dhillon was saying of

15  other income, which is minimal for a select service hotel, we

16  have it at 1,232,000 for the year with its positioning within

17  the market.

18       Q.   So for the first year of operation you've got this

19  hotel generating a little over $100,000 of income per month;

20  is that correct?

21       A.   Absolutely.

22       Q.   What would you have for the second year?

23       A.   Second year you have increases in both occupancy

24  and rate following the market and (indecipherable word)

25  adjustments.  It should go up to 1.439 for room revenue.


NATIONAL COURT REPORTERS (214) 651-8393

1       Q.    All right.

2       A.    Minus any additions.

3       Q.    You heard Mr. Dhillon say, or his projections show

4    that from the get go this hotel is going to be making

5    $150,000 of room revenue per month.

6         What would it take, what would they have to do to reach

7    $150,000 number from the get go?

8       A.    There's different ways to do it, of course.  If you

9    just plug in some figures at the current occupancy that the

10   market is obtaining, you might take $107 room rate, somewhere

11   around there, 105, 107, which is totally tough to do, I'll

12   say that.  Or if you take the same rate and try to bill that

13   type of amount, take 90 percent occupancy, Mr. Dhillon said

14   you just have to -- you know, one or the other is going to

15   have to create the rev par for them.

16      Q.    But this market does not reflect a 90 percent

17   occupancy, does it?

18      A.    No, sir.  Historically, back to 2006, I believe, I

19   did not see any of that.

20      Q.    And this market doesn't reflect $107 average room

21   rate, does it?

22      A.    No.

23      Q.    And to conclude, the market reflects 55 percent

24   occupancy and a room rate of roughly what, 70?

25      A.    73, I think it was.  I'll look again.

1       Q.   All right.

2       A.   And that's from Smith Travel, who records all of

3  this information every month.

4       Q.   All right.

5            MR. ALLEN:  I pass the witness.

6            THE COURT:  Cross?

7            MS. LINDAUER:  Thank you.

8            <u>CROSS-EXAMINATION</u>

9  BY MS. LINDAUER:

10      Q.   Sir, would you look at Exhibit --

11      A.   I'd have to have some help here with all of these

12  books.

13      Q.   I believe it's Exhibit P.

14      A.   P, okay.

15      Q.   And if you would turn on Exhibit P to, it looks

16  like page 8-14.

17      A.   Yes.

18      Q.   This is your discounted cash flow analysis for this

19  property; is that correct?

20      A.   That's correct.

21      Q.   All right.  If we look at your discounted cash flow

22  analysis, sir, you figured projected net income for the first

23  year, '12 through '13, of $360,000.

24           Do you see that?

25      A.   Yes, I do.

NATIONAL COURT REPORTERS (214) 651-8393

1     Q.   The next year 442?

2     A.   Yes.

3     Q.   And the next year 527?

4     A.   Right.

5     Q.   Okay.  If I use your 360 for the first year, that's

6  roughly $30,000 a month; is that correct?

7     A.   Sure.

8     Q.   Okay.  The next year would be roughly $36,800 a

9  month?

10    A.   Right.

11    Q.   And your next year $43,916; is that correct?

12    A.   Uh-huh.

13    Q.   If I look at the debtor's projections, Exhibit 18.

14 You can turn to that in your numbered book.

15       If you look at the required plan payments starting in

16 month two, because month one has admins in it.  But if you

17 start in month two, the required plan payments are 36,392.

18       Do you see that?

19    A.   Yes.  I see that.

20    Q.   All right.  So your first year under your

21 discounted cash flow, you're averaging net income of 30,000 a

22 month.  The debtor needs 36,000 a month.  But counsel --

23 Mr. Dhillon indicated he would take no management fee.  I'm

24 certain your number included a management fee.  So if I add

25 that back in, our net cash flow is very close to what you've

1    projected for your discounted cash flow; do you see that,

2    about 5, $6,000 a month difference?

3         A.   Yes.  Pretty close.

4         Q.   Okay.  The next year, year two, you actually have

5    discounted cash flow that almost is identical with our net

6    income.  You had 36,862.  We have 36,833.  We're actually $29

7    apart the second year.

8         A.   Are you discounting that?  If you look at

9    current --

10        Q.   I'm just taking your forecasted net income.

11        A.   Okay.

12        Q.   And then the last year with your forecasted net

13   income, we actually increase -- we actually have an extra

14   $7,000 a month; do you see that, because your forecasted net

15   income in the last year is 43,916.

16        A.   Right.  I mean, we're not looking at, when we do

17   this report, all of these additional payments you're

18   mentioning.  So, I mean, it's just something --

19        Q.   Right.  But the point is, if I take your discounted

20   cash flow and I compare it with our cash flow, which are both

21   projections of the future of this property, our net cash flow

22   and your net cash flow are not that far apart for those three

23   years.  In fact, the last year your's is significantly higher

24   than our's?

25        A.   Right.

NATIONAL COURT REPORTERS (214) 651-8393

1              MS. LINDAUER:  Your Honor, I'll pass the

2    witness.

3              THE COURT:  Redirect?

4              MR. ALLEN:  Your Honor, could I move for the

5    admission of the appraisal report at this time?  It was one

6    of the exhibits not admitted earlier.

7              MS. LINDAUER:  Your Honor, no objection.

8              THE COURT:  That's Exhibit O?  Exhibit P?

9              MS. ALLEN:  Yes, Your Honor.

10             THE COURT:  Exhibit P is admitted.

11        Did you have any redirect?

12             MR. ALLEN:  I have no further questions.

13             THE COURT:  Thank you.  The witness may step

14   down.

15        Any other evidence you wish to present?

16             MR. ALLEN:  No other witnesses, Your Honor.

17             THE COURT:  Okay.  Does anyone else wish to

18   present any other evidence?

19        Okay.  I'll hear closing.

20        Ms. Lindauer.

21             MS. LINDAUER:  Thank you, Your Honor.

22        Your Honor, very briefly.  I think what we've tried to

23   establish is this is a property that has some value.  It's

24   been shut down for a year and a half.  The owner has made a

25   decided decision to put some substantial dollars into this

1  property, to borrow some money from people, obligate himself

2  personally to repay those dollars, and try to ramp up this

3  hotel and get it operational.

4       What I would ask the Court to look at, and I think it's

5  the best evidence is Exhibit 18.  Our projections, I think,

6  clearly show the debtor will be able to make the plan

7  payments.  We've projected two months of being shut down.  If

8  the Court confirms a plan in June, the first plan payments

9  wouldn't be due until July.  July and August would be our two

10  months that we're shut down still, potentially, with no

11  revenue.  Although we show June and July, it should really be

12  July and August, because the plan payments don't start for

13  roughly a month, if you will.

14       So, Your Honor, basically the debtor will for the next

15  two, to two and a half, three months maximum, renovate the

16  hotel.  Get it up and going.  And be able to make the

17  payments called for by the plan.

18       Your Honor, if you turn to Exhibit 17.  Based on the

19  stipulation of value, if we take a 3.9 million value for the

20  property, we subtract off the 611,000 in taxes that are first

21  lien, that puts the indebtedness to UCB at 3 million 288.

22  That puts our payment right above, if you look up above, a

23  little higher than the 18,075,705, but not much.  So it's a

24  difference of about $80,000 stipulating to that amount.  So

25  our payments are going to be really close to what we've

1   proposed here.  And those are the projections that we carried

2   forward on Exhibit 18.

3        Your Honor, I think with our stipulation on value and

4   insurance, we've resolved Belfor's objection.  That would

5   leave our only objecting party to be UCB.  Your Honor, I

6   think based on the evidence presented, the debtor has made a

7   good faith effort to put forward a plan that we believe is

8   feasible, that it is in the best interest of the creditors,

9   and the estate.  Quite frankly, it's in the best interest of

10  UCB.  UCB walks away with some $800,000 in insurance

11  proceeds.  The debtor renovates the hotel.  If the debtor

12  fails, then UCB gets a renovated property back.

13             THE COURT:  Okay.  All of that is -- you're

14  assuming that UCB is going to receive all 800,000 of --

15             MS. LINDAUER:  Well, it doesn't matter.  We

16  stipulated to a value, exclusive of the insurance money.

17             THE COURT:  I understand.

18             MS. LINDAUER:  Right.  So if their claim is

19  6.3 million, they picked up 6, or 7, $800,000 against a

20  potentially -- would be an unsecured claim.  But in any

21  event, we're using 3.9 million.  The only reduction we're

22  taking is the first lien for taxes.  And UCB picks up about 6

23  or 700,000 from the debtor and a renovated hotel in 60, 90

24  days.  Obviously if the debtor doesn't spend the money,

25  doesn't renovate the hotel, the plan will fail and UCB will

1  be able to foreclose.

2      We're not impairing their ability to retain all of

3  their default rights, all of their lien rights, and things in

4  the event of a failure of the debtor to perform.  So the

5  debtor going forward, there's a substantial risk.

6      Your Honor, I believe based on this evidence, that the

7  Court should confirm the plan.  I do think it's in the best

8  interest of all creditors.  And I think it does achieve the

9  purposes of the Bankruptcy Code and 1129.

10      Thank you.

11          THE COURT:  Let me understand your numbers

12  real quickly.

13      The numbers that you ran through for the treatment of

14  UCB claims, you assume there's a deduction from the value of

15  the property for the unpaid taxes, this 611,000, right?

16          MS. LINDAUER:  Correct.

17          THE COURT:  But you're not assuming there's a

18  deduction, an additional deduction of 880, are you?

19          MS. LINDAUER:  No.

20          THE COURT:  Okay.

21          MS. LINDAUER:  No, Your Honor.

22      And because we stipulated that --

23          THE COURT:  That would be decided separate.

24          MS. LINDAUER:  Well, we've basically given

25  them the insurance money.  We're not going to even deal with

1   that.

2              THE COURT:  Well, you haven't given it to

3   them, because they have to fight for it with other people,

4   correct?

5              MS. LINDAUER:  Well, correct.  Correct.  But

6   it doesn't impair what we actually pay them under the plan.

7              THE COURT:  Understood.

8              MS. LINDAUER:  Thank you.

9              THE COURT:  Ms. Worsham.

10             MS. WORSHAM:  Your Honor, we believe that

11  totality of the circumstances show that this plan cannot be

12  confirmed.  The numbers just don't work.  And the plan is not

13  feasible under any scenario, any number.  There's a shortfall

14  from the get go.  He's got payments due starting immediately

15  and no revenue to come in for the first 90 days, 90 to 120

16  days.  To the extent he's attempting to use the money for

17  repairs to cover the operating expense, he doesn't have the

18  money to do the repairs.

19             THE COURT:  Okay.  All of that assumes -- your

20  shortfall from the get go assumes that revenues start in the

21  month of August.

22  Is that your assumption?

23             MS. WORSHAM:  Yes, Your Honor.

24             THE COURT:  Because of Exhibit 18.  Okay.  I

25  thought Ms. Lindauer explained that under the plan, it

1   assumes a two month shut down, which in this event would

2   be -- isn't that July and August?

3              MS. WORSHAM:  I think we testified to three.

4              THE COURT:  Because we --

5              MS. LINDAUER:  If the plan is confirmed today,

6   we will be shut down in June.  The first plan payment would

7   start in July.  And if we open in August or September, we'd

8   have two months that we would have to carry plan payments for

9   which there potentially would be no income.

10             THE COURT:  Right.

11             MS. LINDAUER:  A maximum two months.

12             THE COURT:  But those two months are accounted

13  for in the funds to be --

14             MS. LINDAUER:  Correct.  That's why the funds

15  are 697,000.

16             THE COURT:  Okay.

17             MS. WORSHAM:  Okay.  If she's doing it that

18  way, these were new projections and she doesn't have the

19  money to repair the hotel, because she's taking the money out

20  of the repair budget to pay the first couple of months of

21  plan payments.

22             THE COURT:  Is that right, Ms. Lindauer?

23             MS. LINDAUER:  I don't think so.  Because the

24  repairs are just under 600,000 and I have 697,000.  So I have

25  an extra almost $100,000 to cover the --

1            THE COURT:  The other plan related expenses,

2   right?

3            MS. LINDAUER:  Correct.  So I can start my

4   plan payments, even though I haven't completed all of the

5   repairs.

6        And truthfully, we'll rush those repairs, you

7   understand.  I mean, this thing isn't going to be shut down

8   45 days.

9            MS. WORSHAM:  Well, I recall the testimony

10  differently.

11           THE COURT:  I mean, I want to make sure we're

12  all on the same page on the numbers.  I thought the numbers

13  were that the funds coming in exceeded the projected repair

14  costs by not quite $100,000, a little bit less than that,

15  which was going to cover the cost of the plan related

16  payments.

17           MS. WORSHAM:  Well, Your Honor, my

18  recollection was they deposited 350, or 345 in Ms. Lindauer's

19  account.  They deposited another 47,000, which are escrowed

20  for the first five months of property taxes.  Those are

21  earmarked for that.  And then they have the loan from

22  Mr. Pate to do the repairs.  So it's not actual money.

23  That's labor that he's advancing and Mr. Dhillon personally

24  is paying it back.

25       So I don't know how the 697 was arrived at, honestly.

1            THE COURT:  Okay.

2            MS. WORSHAM:  So believe --

3            THE COURT:  You can keep going.  But,

4    literally, I have like eight judges on the phone waiting for

5    me right now.

6            MS. WORSHAM:  I'm sorry.

7        That there be a shortfall in the beginning.  The

8    600,000 in repairs does not take into account the cost to

9    bring the property into ADA compliance or complete the check

10   list from the Holiday Inn.  Mr. Dhillon, personally, has a

11   $9.7 million judgment against him.  And his testimony

12   regarding his salary, I believe that if he's to make up any

13   shortfall, we don't believe there's a commercial

14   reasonableness or viability that he can do so.  And we think

15   it will be followed by a Chapter 7 -- excuse me, a subsequent

16   bankruptcy.

17       The debtor is further asking you to believe that after

18   being shut down for 19 or 20 months, the Holiday Inn is going

19   to open and magically revenues would be higher at 150,000,

20   when they never achieved that monthly rate at any time during

21   their operations since 2006.

22       The totality of the circumstances, we believe, show it

23   was not proposed in good faith.  The plan is all about

24   preserving equity, which can be done in certain cases.  We're

25   not disputing that.  But we believe you should allowed to

1    look at the debtor's motives here in that he's asking UCB to

2    shoulder all of the risks in hopes that the property will

3    appreciate enough where Mr. Dhillon can pay back his investor

4    fraud settlement due to Dr. Sony.  It's not in good faith.

5    It's not fair and equitable to UCB.  And we believe the

6    numbers do not show this -- Jag has not testified where he

7    can come up with the additional money, other than borrowing

8    it from somebody, seeking other investors.  He's got to pay

9    Mr. Pate 8,000.  Got to cover the shortfall.

10       And, further, we believe that this is a violation of the

11   absolute priority rule.  It appears from Exhibit 18 that

12   there's $250,000 for maintenance repairs that's being paid

13   back to Mr. Dhillon for the first two months of June and July

14   of 2012 and then the maintenance and repairs go down to

15   2,500.

16       There's no good economic reason to confirm the plan.

17   We do not believe it's in the best interest of the creditors.

18   They're trying to cram us down twice, in essence.  We agree

19   the property taxes are owed there.  But we don't believe --

20              THE COURT:  What's the cram down twice?  What

21   does that mean?

22              MS. WORSHAM:  Well, they wanted us to

23   shoulder, initially, the insurance.  That's off the table.

24   Except we have to fight with the proceeds.  We're not going

25   to get them right away.  We've got the value crammed down.

1    And then they want to take the insurance -- the property

2    taxes off the top, which admittedly in a Chapter 7, those

3    would be addressed first.  So we believe all of the factors

4    together would show that this is not fair and equitable to

5    UCB or in the best interest.  And we would ask that the Court

6    not confirm the plan as not being feasible, primarily.

7              THE COURT:  Ms. Lindauer.

8              MS. LINDAUER:  Your Honor, just very, very

9    briefly.

10        We stipulated to their value.  We stipulated to their

11   interest rate.  It's a three year plan.  It's very short.

12   The debtor is making its best efforts.  We are putting in a

13   total of $697,000.  The Bank gets an improved piece of

14   collateral back.  We've restructured all of our debts.  I

15   believe Mr. Meyers, with our stipulation, we've satisfied

16   Belfor's objection to the plan.  That only leaves one

17   objecting creditor.  We meet the requirements for 1129.  I do

18   believe the plan is proposed in good faith.  I think that by

19   giving UCB all of the insurance proceeds, whatever that

20   number ultimately is, it's not coming off the value.  So they

21   get whatever is there.  And I think that's significant.

22   They're already holding $600,000.  They get to basically keep

23   that.  Whatever they work out these other creditors --

24             THE COURT:  Well, if it's their collateral,

25   it's their collateral.  The only difference is it's cash now

1   as opposed to real estate.

2              MS. LINDAUER:  Right.

3              THE COURT:  If it's their collateral, they're

4   entitled to it.  Their claim is over $6 million, right?

5              MS. LINDAUER:  Right.  Well, but here's the --

6              THE COURT:  So it's not like they're getting

7   this big windfall.

8              MS. LINDAUER:  No, I understand.  I

9   understand.

10             THE COURT:  They're taking a write down of

11  several million dollars.

12             MS. LINDAUER:  No, I hear you.

13       The big difference, Your Honor, though is is that's

14  money that should have ultimately -- should have gone back

15  into the hotel to fix the hotel.  It didn't.  And so we're

16  not insisting that it go there.  My client is willing to say,

17  Look.  I'll put in my own new money to make improvements to

18  your collateral, Bank.  You keep that insurance money.  I'm

19  not insisting that you put it back into the hotel to fix it

20  up.  We could have easily come in here and argued about that

21  and say, Your Honor, they should put that money back in.

22  We're not asking for that.  We're saying, You take it.  You

23  apply it on your debt how you best desire to apply it.  All

24  we're asking for is we think this plan is feasible and we

25  should be given an opportunity to go forward with this hotel.

1   And I do think it's in the best interest of all of the

2   creditors, not simply UCB.

3        So, Your Honor, I think based on the facts before the

4   Court, the Court should confirm this plan.  I don't see a

5   reason why the Court wouldn't confirm the plan, other than

6   you may have your own reasons.  But I would hope that you

7   would confirm the plan.

8              THE COURT:  Okay.  Well, I've looked through

9   these numbers.  I've studied the positions of the parties and

10  looked through the evidence, as well, and heard you on the

11  evidence on the record today.  Frankly, I'm concerned too.  I

12  think this is -- there's some serious questions about whether

13  this debtor can make it.

14       But the standard of proof here, for purposes of plan

15  confirmation is preponderance.  I don't have to be certain.

16  I don't have to have that warm fuzzy feeling that you're

17  going to -- everybody is going to get paid and everything is

18  going to be wonderful.  But I have to find that on a

19  preponderance of the evidence that the debtor has proven that

20  this plan is feasible.  And I agree it's a really close call.

21  This is not a 75 percent comfort level on the proof.  But I'm

22  convinced that for the purposes of today's hearing that the

23  debtor has met its burden of proof with respect to the 1129

24  factors.

25       Given the Court's own timing issues, I'm going to ask

1  Ms. Lindauer to submit a proposed form of order with --

2            MS. LINDAUER:  I'll forward it to Ms. Worsham,

3  we work very well together.

4            THE COURT:  And I want you to incorporate into

5  the form of order, and you all can negotiate and if not I'll

6  come up with my own form of order, specific triggers and

7  relatively short deadlines, notice, and cure periods for the

8  lender to be able to exercise their rights if the funds are

9  not deposited timely.  You guys can negotiate what that

10 timely is.  So I want the money put up up front, or there's a

11 default.

12           I want the repairs to be substantially completed on the

13 schedule set forth in the plan.  I want the payments to

14 commence, as set forth in the plan.  And if payments are not

15 made, the lender can -- will provide a 14 day cure period.

16 If the debtor fails to make timely payments, in other words,

17 if the Bank issues two notices of default, the third time,

18 there's no cure period.  The lender is entitled to commence

19 foreclosure proceedings immediately.  Okay?

20           It appears to the Court, given how close a call this

21 is, that the debtor is going to be given an opportunity to go

22 forward with their plan.  On the other hand, the lender is

23 going to be given relatively quick triggers and a relatively

24 short leash for the debtor.  If the debtor does not perform

25 as they said that they would perform.  Okay?

1          MS. LINDAUER:  Fair enough.

2          THE COURT:  So you all can propose a form of

3  order to the Court that the parties can negotiate out the

4  terms of a cure and default.  I'll look at it.  If I don't

5  like it, I'm not signing it.  I'll make my own changes.  But

6  I just don't have the time right now, given our own other

7  schedule, to work through all of the specific terms.  So I'll

8  let you all propose one to the Court.  I need you to submit

9  that order as soon as you can.

10         MS. LINDAUER:  Okay.  We will, Your Honor.

11         THE COURT:  And given that we're going to be

12  in trial and other things throughout the next couple of

13  weeks, as soon as you do that, you need to let my courtroom

14  deputy know when it's been uploaded.  Okay?

15         MS. LINDAUER:  Your Honor, one thing on the

16  three notices of default.

17      Can we make that in a 12 month period, three notices

18  within a 12 month period?

19         THE COURT:  No.  It's only three years, right?

20         MS. LINDAUER:  It's only three years, correct.

21         THE COURT:  Okay.  So nine defaults in three

22  years is not going to work.  If I thought you were going to

23  default nine times in a three year period, I wouldn't confirm

24  your plan.

25         MS. LINDAUER:  I understand.  I had to ask.


NATIONAL COURT REPORTERS (214) 651-8393

1   But I hear you.

2               THE COURT:  You always ask, Ms. Lindauer.

3               MS. LINDAUER:  I may not get it, but I always

4   ask.

5               THE COURT:  Okay.

6               MS. LINDAUER:  Thank you, Your Honor.

7               MR. LERNER:  Just one thing.  We had agreed to

8   give the debtor 120 days.  And I just don't want a situation

9   where the Bank can terminate and --

10               THE COURT:  120 days for what?

11               MR. LERNER:  To re-open.  All I'm asking is is

12   that whatever is given to the Bank, I don't want a situation

13   where the Bank forecloses and we still have the license out

14   there.  I would like for Holiday Hospitality to be able to

15   terminate coterminous with the Bank.

16               MS. LINDAUER:  No problem, Your Honor.  And

17   we'll write it that way.  And we'll run the order by

18   Mr. Lerner, also.

19               THE COURT:  Okay.

20               MS. LINDAUER:  Yeah.  That shouldn't be a

21   problem.

22               THE COURT:  Thank you.  Parties are excused

23   and we're adjourned.

24                    (End of Proceedings.)

25

```
1                 C E R T I F I C A T E

2           I, CINDY SUMNER, do hereby certify that the

3  foregoing constitutes a full, true, and complete

4  transcription of the proceedings as heretofore set forth in

5  the above-captioned and numbered cause in typewriting before

6  me.

7

8

9

10

11

12

13

14                          /s/Cindy Sumner

15                          _____

16                          CINDY SUMNER, CSR #5832
                            Expires 12-31-13
17                          National Court Reporters
                            16 Gettysburg Lane
18                          Richardson, Texas  75080
                            214 651-8393
19                          Firm #417

20

21

22

23

24

25
```